No. 45,873

STATE OF KANSAS, *Appellee,* v. JAMES EDWARD HINKLE, *Appellant.*

(479 P. 2d 841)

Opinion filed January 23, 1971.

*Robert J. Foster,* of Kansas City, argued the cause and was on the brief for the appellant.

*Frank D. Menghini,* County Attorney, argued the cause, and *Kent Frizzell,* Attorney General, and *Nick A. Tomasic,* Chief Deputy County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal from a conviction of murder in the first degree by a sixteen year old youth who participated in a gang-style slaying. After waiver of jurisdiction by the juvenile court, the defendant was tried in the district court, and upon conviction was sentenced to life imprisonment in the State Industrial Reformatory at Hutchinson, Kansas.

The specifications of error primarily involve the admission into evidence of a recorded statement made by the defendant prior to trial and the giving of instructions.

On the night of August 29, 1968, James Edward Hinkle (defendant-appellant) and three of his friends participated in a gang-style slaying of another teenage boy who was unknown to them. The appellant and his friends were armed with a sawed off automatic .22 caliber rifle and a knife when they picked up a hitchhiker by the name of Robert Wayne Wood in the area of the K. U. Medical Center in Kansas City, Kansas. Wood had voluntarily accepted their offer of a ride in an automobile and participated in drinking beer they supplied to him. It was late at night and as the group traveled through Wyandotte County in the automobile, they proceeded to rob Wood at knife point, following which they drove out to an isolated area, parked the automobile, and after fighting with Wood fired the .22 caliber rifle a number of times into his body.

The other defendants also charged with first degree murder were Mike Coleman, age sixteen; Mike Murphy, age eighteen; and "Pepper" Jackson, age twenty.

It was while Jackson and Wood were fighting, going down an embankment away from the car into a field, that Murphy cut loose with his automatic rifle and began shooting into Wood, according to the record. Jackson then stabbed Wood with a seven-inch knife. Murphy at the instruction of Jackson handed the gun to the appellant and Jackson ordered the appellant to shoot Wood, whereupon the appellant took the rifle and at close range fired into the body of Wood. (The appellant in his statement said he shot over the body, not into it.) When the gun was empty it was reloaded and Jackson and Murphy shot into the body several more times. The body was then dragged a few feet to weeds, covered over and left. The knife, gun and possessions belonging to Wood were thrown out of the automobile on the way home. The gun was thrown out while crossing the bridge over the Kaw River, but was recovered during the investigation and used as evidence in the trial.

Approximately ten days after the incident the wife of Pepper Jackson notified the state highway patrol at Willow Springs, Missouri, of a conversation she had overheard relative to the killing. Thereafter the Johnson County sheriff's office was notified by telegram.

Neither the sheriff's office of Johnson County nor the sheriff's office of Wyandotte County, upon receiving word of the incident, had prior information that a murder had been committed within the past two weeks. At the time it was uncertain from the information received in the telegram whether the alleged murder took place in Johnson County or in Wyandotte County. The telegram merely described the area of Inland Drive and mentioned Holliday, Kansas, an area at the boundary line of the two counties.

An investigation pursued with approximately six or seven officers who went out to search the area. They were unable to find a body or anything in the areas described, or in an area from which an odor had previously been reported on Inland Drive.

Officers from both Johnson and Wyandotte Counties then proceeded to the home of the appellant who was mentioned in the telegram. Upon their first call the appellant was not at home, but his parents advised the officers they would call upon their

son's arrival. Shortly thereafter the parents notified the authorities the appellant was home, and the officers returned to the home and asked for the appellant. They showed the telegram to the appellant's parents and told the parents what they wanted to talk to him about. The parents gave their consent for the officers to talk to the appellant, and he thereupon came into the front room of the home with the officers.

Officer Kielman then testified as follows:

"Q. All right. Then what, if anything, happened?

"A. We—I don't remember exactly which one of the officers it was that started talking to him and identified ourselves to the young man, and told him that we wanted to talk to him on a serious matter.

"Q. Then what happened, sir?

"A. He stated to us that—he more or less broke down and said that he knew what we wanted to talk to him about, and that he wanted to get it off his chest.

"Q. All right. Now at any time there at the home, Mr. Kielman, was this individual—where were the parents, by the way, at this time?

"A. The parents were in the front room—all of us were in the front room.

"Q. That's you and your partner, Mr. Patton, and the two officers from Johnson County, is that correct?

"A. Yes, sir.

"Q. And the parents and the boy?

"A. Yes, sir.

"Q. And at any time—what, if anything, did you tell this boy concerning his constitutional rights?

"A. One of the officers—I don't remember which one it was—stopped the boy in the middle of him starting to talk and advised him of his rights at this time, and—

"Q. (Interrupting.) Was that in the presence of the parents, officer?

"A. Yes.

"Q. What, if anything, was said about constitutional rights there at the home?"

Officer Kielman thereupon answered that the appellant was fully advised of his constitutional rights, testifying in detail to show full compliance with *Miranda*.

Two of the officers present at the home then took the appellant in their automobile to search for the body of Wood, and after approximately a one-half hour search gave it up without success. They returned to the sheriff's office in Johnson County with the appellant. The appellant's parents proceeded with the other officers to the sheriff's office in Johnson County.

Officer Geurian testified after they arrived at the sheriff's office in Johnson County that he advised the appellant of his rights in

accordance with *Miranda* in the presence of the appellant's parents, and that the appellant and his parents all understood their legal rights. He then testified:

"Q. After you advised him of his rights, what then took place?

"A. He talked it over with his parents and asked them what they thought he should do, and they told him to do whatever he thought was right. It was his decision to make, and he should make the—do whatever he thought was right.

"Q. And what was his decision, if you know?

"A. He stated he would give us a statement.

"Q. All right. Then what happened?

"A. Then we took the boy, along with the court reporter and Captain Lane and myself, to another office where we took a statement, after having advised him of his rights again.

"Q. All right. Were you present when his rights were advised again?

"A. Yes. I was.

"Q. And who advised him this time?

"A. Captain Lane.

"Q. All right. And was his rights explained to him a further time?

"A. They actually were explained, then, in the statement also. Before the statement, we read him a waiver of rights form, another one, and it was read into the statement.

"Q. You read one while the court reporter was taking the statement?

"A. Yes.

"Q. So he was advised how many times?

"A. At least three times."

The statement of the appellant was then taken by Captain Lane and Detective Geurian conducting the interrogation, and everything was recorded by a certified shorthand reporter. In substance the statement revealed information in accordance with the facts heretofore related.

While the statement was being taken the appellant was in a room alone with the interrogating officers. His parents were waiting in an adjoining room, but they were not specifically excluded from the room where the statement was taken.

Throughout the trial and on appeal to this court the appellant was represented by retained counsel.

The appellant contends the trial court erred in admitting the written statement of the appellant into evidence because it was the result of an interrogation of a sixteen year old juvenile outside of the presence of his parents and/or juvenile officer.

On this point the appellant relies upon K. S. A. 1970 Supp. 38-815 (*b*) for the proposition that the officers, upon realizing that the appellant was a person of juvenile age, were required to take him

immediately before the proper juvenile authorities and/or his parents. The foregoing provision of the statute reads:

"(b) When any peace officer takes into custody a child under the age of eighteen (18) years, with or without a warrant or court order, such child shall not be taken before a justice of the peace, police judge, magistrate or judge of any other court now or hereafter having jurisdiction of the offense charged, but shall be delivered into the custody of the probation officer or be taken forthwith before the juvenile court; and it shall be the duty of such peace officer to furnish such juvenile court with all of the information in his possession pertaining to said child, its parents, guardian or other person interested in, or likely to be interested in, the child, and all other facts and circumstances which caused such child to be taken into custody."

We fail to see the application of the foregoing statute to the situation here presented. It does not state that a juvenile under the age of eighteen years cannot be questioned by police officers. All it states is that he is to be taken before the juvenile court prior to being taken to any other court having jurisdiction of the offense charged.

Here neither the Wyandotte nor the Johnson County authorities were aware that this particular crime had been committed until both authorities received a teletype from the Missouri highway patrol office in Willow Springs, Missouri. The teletype stated that a girl in Willow Springs, Missouri, reported a gang murder in Kansas, and that the appellant participated in the killing. No body was found after a search of the area described in the teletype. Officers from the sheriff's office in both counties then contacted the appellant, since he was named in the teletype, to see what he knew of the incident. The officers were met by the appellant's parents at the home and were allowed to talk to the appellant at his home. When the appellant stated he wanted to get it off his chest he was immediately advised of his rights before any further questioning. His parents were present at all times at the home. Since the location of the alleged crime appeared to be in Johnson County, Kansas, the officers from the Johnson County sheriff's department took the appellant and both of his parents to the Johnson County sheriff's office to obtain a statement. At this time no body had been found and no statements had been obtained. While at the Johnson County sheriff's office and in the presence of both parents, the appellant was again advised of his constitutional rights several times before he gave his recorded statement with the consent of his parents.

While his statement was being obtained, two officers from the

Wyandotte County sheriff's office were talking to another boy in Wyandotte County, Kansas. This boy, who also participated in the slaying, led them to the crime scene where the body was discovered. The location of the body revealed that the crime scene was in Wyandotte County, Kansas.

After the appellant's statement was taken and after the body was found in Wyandotte County, Kansas, the appellant was then taken to the Wyandotte County juvenile court where on the 7th day of September, 1968, one day after his statement was obtained, he was charged by petition in the Wyandotte County juvenile court with murder in the first degree.

No question whatever is raised by the appellant on appeal concerning the waiver of the juvenile court's jurisdiction and the certification of this case to the district court for the prosecution of the appellant as an adult. (See *In re Templeton*, 202 Kan. 89, 447 P. 2d 158; and *In re Long*, 202 Kan. 216, 448 P. 2d 25.)

The record is clear, that when the sheriff's officers delivered the appellant to the juvenile authorities in Wyandotte County, he had never been taken to any other court of any jurisdiction.

Police officers are authorized to investigate and obtain information from a juvenile relative to a crime, and when there are sufficient grounds to believe a crime has been committed and the juvenile committed the crime, they must then deliver the juvenile into the hands of the proper juvenile authorities along with all information in their possession.

A confession is not inadmissible merely because the person making it is a minor. *(United States v. State of New Jersey*, 323 F. 2d 146 [3rd Cir. 1963]; and *United States v. Lovejoy*, 364 F. 2d 586 [2nd Cir. 1966], cert. denied 386 U. S. 974, 18 L. Ed. 2d 135, 87 S. Ct. 1168.) Age of the minor, however, in conjunction with other extenuating circumstances, is a factor to be considered in determining the voluntariness and admissibility of his confession in evidence. (*Haley v. Ohio*, 332 U. S. 596, 92 L. Ed. 224, 68 S. Ct. 302 [1948]; *Reck v. Pate*, 367 U. S. 433, 6 L. Ed. 2d 948, 81 S. Ct. 1541 [1961]; and *Gallegos v. Colorado*, 370 U. S. 49, 8 L. Ed. 2d 325, 82 S. Ct. 1209, 87 A. L. R. 2d 614 [1962], reh. denied 370 U. S. 965, 8 L. Ed. 2d 835, 82 S. Ct. 1579.) Cases holding admissible the confession of a sixteen year old defendant where the confession was freely and voluntarily given are: *People v. Magee*, 217 C. A. 2d 443, 31 Cal. Rptr. 658, cert. denied 376 U. S.

925, 11 L. Ed. 2d 620, 84 S. Ct. 688, reh. denied 376 U. S. 967, 11 L. Ed. 2d 985, 84 S. Ct. 1126; *State v. Francois*, 197 So. 2d 492 (Fla. 1967); and *People v. Stephen J. B.*, 23 N. Y. 2d 611, 298 N. Y. S. 2d 489, 246 N. E. 2d 344 (1969). An extended annotation on the "Voluntariness and admissibility of minor's confession" appears in 87 A. L. R. 2d 624-633; and in A. L. R. 2d Later Case Service, supplementing 85-91 A. L. R. 2d, at page 174.

Here the voluntariness of the appellant's written statement was determined by the trial court on a motion to suppress prior to trial. Upon a full hearing, which the appellant does not challenge, the trial court overruled the motion to suppress and determined the written statement to be admissible in evidence, finding that it had been freely and voluntarily given after the appellant had been fully apprised of his rights pursuant to *Miranda*.

The guidelines set forth in *Miranda v. Arizona*, 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A. L. R. 3d 974 (1966), apply to confessions and admissions. These guidelines are the measure for courts to apply in determining whether a confession or statement is voluntarily made and admissible.

On the facts in this case there is a distinction between the investigatory stage of the case, wherein the appellant said he wanted to get it off his chest, and the custodial interrogation which ensued thereafter.

In *Miranda* the court said:

"Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . ." (p. 477.)

The record here discloses that once the appellant stated he wanted to get it off his chest, the investigating officers stopped him from saying anything further, and he was immediately advised of his constitutional rights. His parents were present at all times, fully aware of the situation, and consented to the interrogation.

In *State v. Phinis*, 199 Kan. 472, 430 P. 2d 251, it was said:

"We hold the trial court properly determined that any statements made by defendant at the cabin were elicited by the officers in the investigatory stage of the inquiry before the investigation had begun to focus on the defendant. We further hold that defendant was advised of her constitutional rights before the accusatory stage within the purview of *Miranda*. Any statements made by her in response to custodial interrogation were made after she was properly advised of her rights, were made voluntarily and knowingly and were properly admitted in evidence by the trial court." (pp. 480, 481.)

Confessions or admissions voluntarily made are not inadmissible because made at a time when the accused in a criminal action did not have counsel. (*State v. Weinman*, 201 Kan. 190, 193, 440 P. 2d 575; and cases cited therein.)

Here the appellant, after having been fully informed of his constitutional rights in accordance with *Miranda*, which both he and his parents understood, waived his right to have counsel present when his statement was taken, and freely and voluntarily made a statement thereby waiving his right to remain silent.

The appellant contends the trial court erred in refusing his request to instruct the jury on first, second and third degree manslaughter.

The trial judge instructed on murder in the first degree and murder in the second degree, but refused to instruct on manslaughter, stating in his comments:

". . . I considered manslaughter instructions, because I know that the ordinary rule is that all lesser degrees of any crime must be submitted to the jury if there is any evidence to support any of them. And I went through the provisions in the crime act relative to manslaughter, and I couldn't find a single degree of manslaughter—and some of those degrees, of course, have several aspects—I couldn't find any degree of manslaughter, as defined in our statutes, that would support a conviction on such degree in this case. It just had to be murder in the first degree, murder in the second degree, or not guilty. . . ."

All degrees of manslaughter as defined by the statutes here applicable require that the killing be accomplished "without a design to effect death." (K. S. A. 21-407; 21-411; and 21-413.) The record does not support the appellant's contention that the shooting was without a design to effect death. The evidence discloses the victim was shot over twenty times with the modified automatic rifle placed in evidence, that he was stabbed once in the side, and that the appellant stood over him and fired a number of times into the victim's body.

In *State v. Gray*, 189 Kan. 398, 369 P. 2d 330, the court treated a similar contention by the appellant and said:

". . . When this defendant stood over his wife at such close range with a loaded pistol and proceeded to shoot her six times, once in the neck and five in the area of the head, he cannot be heard to claim that the killing was without a design to effect death, or that any other element of manslaughter in any degree was present. . . ." (p. 403.)

Our court has consistently adhered to the rule that in a prosecution for first degree murder, failure to instruct the jury on any lesser degree is not error if the evidence at the trial excludes the

theory of guilt on any lesser degree of the crime. (*State v. Hoy,* 199 Kan. 340, 430 P. 2d 275; *State v. Noble,* 175 Kan. 398, 264 P. 2d 479; and *State v. Germany,* 173 Kan. 214, 245 P. 2d 981.)

Here the requested instructions on manslaughter were properly refused because there was no evidence of any nature disclosed in the record to warrant an instruction on manslaughter.

Other contentions advanced by the appellant in his motion for a new trial have either been abandoned on appeal, or they have not been shown to be of sufficient gravity to say the appellant was prejudiced in the trial of his case.

The judgment of the lower court is affirmed.