No. 47,028

GARY L. SMITH, a minor, by and through his natural mother and guardian, FLORA COOK, *Appellant,* v. DON MILLER, President of Board of Education, et al., *Appellees.*

(514 P. 2d 377)

Opinion filed September 11, 1973.

*Stephen J. Blaylock,* of the Neighborhood Office of the Legal Aid Society, of Wichita, argued the cause and was on the brief for the appellant.

*William H. Dye,* of Foulston, Siefkin, Powers and Eberhardt, of Wichita, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

HARMAN, C.: Gary L. Smith, a student, was expelled from school by the board of education of Unified School District No. 259, Sedgwick county. Upon judicial review the expulsion was upheld and Gary brings the matter here. Primarily, procedural defects are urged upon appeal.

Brief review of the facts and administrative proceedings should first be made.

On September 11, 1972, four separate assaults upon students occurred in and about the hallways of Wichita West High School. Three of the persons assaulted came either to the school office or the nurse's office to report the assaults and to obtain medical treatment. None of these three could identify his assailant. The fourth student assaulted was Martin W. Clemence. The attack upon him was reported the next morning when his mother telephoned the principal. Later Martin told the principal he knew his assailant by sight but not by name and that the same person had assaulted him the year before. Martin identified a picture of Gary L. Smith which appeared in the 1971-1972 school annual as that of his assailant. The picture was a one inch square photograph of Gary.

Gary had been suspended twice for assaults during the 1971-1972 school year, the first coming in the second week of school and the second occurring in February after his readmission for the second semester.

Martin indicated to school authorities that he preferred not to testify in person. Accordingly an affidavit stating the essentials of the assault was prepared, which Martin signed. The affidavit stated that Martin encountered a group of seven to ten black students as he was walking through a corridor. While going through the group he was "hit by a fist on the right side of [his] face." The affidavit concluded with this paragraph:

"3. I recognized my assailant, but did not know him by name until I went to the office of the principal of West High School and positively identified Gary Smith as the assailant from looking at the School Annual. Likewise, I am sure that he is the one that assaulted me last year. There is no question in my mind when reviewing the photographs that Gary Smith was my assailant."

On September 12, 1972, the principal addressed the following letter to Gary's parents:

"This is to inform you that your son, Gary Smith, has been suspended from Wichita High School West for gross misconduct.

"I am also recommending that Gary be expelled for the remainder of the school year. A hearing has been set by Mr. Jim Gates, Director of Pupil Adjustment, Educational Services Building, Room 101, 640 North Emporia, Monday, September 18, 1972, at 10:00 a.m. You are invited to attend this hearing if you so desire. The hearing will be conducted by Mr. Gates or a committee of certified employees which he may appoint. Whether or not Gary is to return to school will be determined at this hearing. He may *not* return to school under any circumstances until after the hearing.

"We are enclosing a copy of the regulations of the Board of Education covering school procedure, as well as a copy of Chapter 300, 1970 Session, Laws of Kansas.

"Please contact the school office (267-8361) if you have any questions."

A hearing on the matter was held September 18, 1972, before Examiner Gates, who was coordinator of the department of pupil welfare and attendance for the board of education. Gary and his mother were present but were not represented by counsel. The examiner had before him Martin's affidavit and the principal's testimony as to Martin's identification. Gary's mother voiced complaints that the key witness against him was not present at the hearing.

On September 20, 1972, the examiner approved and adopted the recommendation to expel Gary and so advised Gary's parents by

letter. His report contained no finding as to whether or not Gary should be permitted to return to school pending any appeal or during the time allowed for notice of appeal.

Gary, through counsel, appealed to the board of education and requested permission to return to school pending the appeal. On October 3, 1972, the examiner wrote a letter to Gary's parents indicating he should be returned to school and recommending his attendance at the Metro Program for the remainder of the semester. Gary declined this program because it was not a regular school with a normal curriculum and he would also have a transportation problem.

October 12, 1972, Gary's appeal was heard by a hearing officer appointed by the board. At this hearing, which was *de novo*, the principal and the examiner testified, and Martin W. Clemence's affidavit as well was offered, in behalf of expulsion. Gary testified in his own behalf. He stated he was in the hall at Wichita West en route to his locker on the afternoon in question when he saw a student being struck; he did not think the student looked at him after he was hit; Gary stated he did not strike anyone that afternoon; he was about five or six feet away when the assault occurred; possibly more than seven boys could have been involved in the assault; he did not know the boy who did the striking and had never seen him before; he knew by name only two of the boys who were involved. Gary stated he was accompanied in the hall by a friend. This friend testified and generally corroborated Gary's statements.

Other testimony received at this hearing will be alluded to in connection with the points raised on appeal.

During the hearing the issue of confrontation and cross-examination of the witness against him was raised on behalf of Gary and inquiry was made as to whether the hearing officer would issue subpoenas for the attendance of witnesses. Request was again made for Gary's reinstatement pending final determination.

The hearing officer promptly prepared a written report containing her findings and a recommendation that Gary be expelled for the 1972-1973 school year, which recommendation was approved and adopted by the board on October 16, 1972.

Immediately, appeal to the district court was taken pursuant to K. S. A. 60-2101 (*a*). There additional pleadings were filed in which Gary asserted violation of his rights to due process in the

actions taken and he also challenged the constitutionality of certain parts of the Kansas statutes pertaining to school expulsion. He requested injunctive and declaratory relief.

The trial court heard the appeal October 20, 1972, and held that the challenged statutes were constitutional, that Gary had been afforded procedural due process throughout, and there was substantial evidence to support the board's ruling. Relief was denied and the matter is here for review. Although in a sense the case is moot in that the school term for which appellant was expelled ended prior to its submission to this court, despite accelerated action at most stages, nonetheless the appeal will be entertained since a real controversy existed and declaratory relief was sought which included the construction, validity and constitutionality of statutes of statewide interest and importance.

We shall refer to the defendant school board and its members simply as appellees.

At this point mention should be made of legislation enacted in 1970 which as amended now appears as K. S. A. Chapter 72, Article 89, entitled Suspension and Expulsion of Pupils. The first section, K. S. A. 72-8901, provides that a public school board or certain of its designated employees may suspend or expel a pupil guilty of particular misconduct. Grounds specified for such action include conduct which substantially disrupts, impedes or interferes with the operation of a school and conduct which substantially impinges upon or invades the rights of others.

K. S. A. 72-8902 establishes a procedure for the administration of three types of disciplinary action: (1) Short term suspension of not to exceed five days in which there is no entitlement to a hearing; (2) extended term suspension for more than five days but not beyond the current school semester, in which a hearing must be afforded the student or his parents or guardians; and (3) expulsion but not beyond the current school year, in which a hearing likewise must be afforded. This section further provides:

"(a) . . . In all cases wherein a pupil or student might be suspended for an extended term or might be expelled, he shall first be suspended for a short term. A written notice of any short term suspension and the reason therefor shall be given to the pupil or student involved and to his parents or guardians within twenty-four (24) hours after such suspension has been imposed. A written notice of any proposal to suspend for an extended term or to expel and the charges upon which the same is based shall be given to the pupil or student proposed to be suspended or expelled and to his parents or

guardians within forty-eight (48) hours after the pupil or student has had imposed a short term suspension. Any such notice of a proposal to suspend for an extended term or to expel shall state the time, date and place that the pupil or student will be afforded a hearing, and such date shall be not later than the last day of the short term suspension of such pupil or student.   .   .   .

    "(c) Whenever any such hearing results in suspension for an extended term or expulsion, the person or committee conducting such hearing may make a finding that return to classes by such student or pupil, pending any appeal or during the period allowed for notice of appeal, is not reasonably anticipated to cause continuing repeated material disorder, disruption or interference with the operation of any public school or substantial and material impingement upon or invasion of the rights of others, in which case such student or pupil may return to his regular classes until the period for filing a notice if appeal has expired with no such notice filed, or until the determination of any such appeal if a notice of appeal is filed. Whenever the person or committee conducting such a hearing fails to make the findings specified in this subsection, the report of the hearing shall provide that the suspension shall continue until appeal therefrom is determined or until the period of suspension or expulsion has expired, whichever is the sooner."

### K. S. A. 72-8903 provides:

    "The hearing provided for in K. S. A. 1970 Supp. 72-8902 shall be conducted in accordance with regulations relating thereto adopted by the board of education. Such regulations shall afford procedural due process, including the following:

    "(a) The right of the student or pupil to have counsel of his own choice present and to receive the advice of such counsel or other person whom he may select, and

    "(b) the right of the parents or guardians of the student or pupil to be present at the hearing, and

    "(c) the right of the student or pupil and his counsel or advisor to hear or read a full report of testimony of witnesses against him, and

    "(d) the right of student or pupil to present his own witnesses in person or their testimony by affidavit, and

    "(e) the right of the student or pupil to testify in his own behalf and give reasons for his conduct, and

    "(f) the right of the student or pupil to have an orderly hearing, and

    "(g) the right of the student or pupil to a fair and impartial decision based on substantial evidence.   .   .   ."

K. S. A. 72-8904 provides that any pupil or student who has been suspended for a long term or expelled may appeal such action to the board of education. Such an appeal is to be conducted under rules consonant with K. S. A. 72-8903 and may be heard either by the board or by a hearing officer appointed by it (a member of the board or a certificated employee of the school district). If the appeal is heard by a hearing officer, such person is required to make

written report to the board, which then determines the appeal, with or without additional hearing.

K. S. A. 72-8906 authorizes any person, hearing officer or member of a committee or the board of education holding a hearing under Article 89, Chapter 72, to administer oaths for the purpose of taking testimony. The act contains no authorization for the issuance of subpoenas.

Appellant's contentions on appeal will be considered in chronological sequence.

Appellant asserts he was denied due process of law under the fourteenth amendment to the federal constitution when he was not furnished the names of any witnesses against him and the substance of the charges against him prior to the first hearing. In their brief appellees acknowledge a student has a legal right to attend public school, subject to valid regulation, and that prior to expulsion he must be given notice and an opportunity to be heard. They assert appellant was given notice of the charges against him—this on the basis that prior to the second *de novo* hearing before the delegated hearing officer appellant knew what evidence would be offered against him. Appellees do not contend appellant had any other kind of advance notice. They further argue that appellant's timely appeal and consequent *de novo* hearing "waived" any procedural defect in the first administrative hearing. The September 12th letter advising of that hearing simply stated appellant was being suspended "for gross misconduct" and that his expulsion was being recommended.

The term due process refers primarily to the methods by which the law is enforced; however the term has no fixed technical concept unrelated to time, place and circumstances. In *Hannah v. Larche*, 363 U. S. 420, 4 L. ed. 2d 1307, 1321, 80 S. Ct. 1502, 1514, this comment was made:

" 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. . . . Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding are all considerations which must be taken into account." (p. 442.)

Prior to the decision in *Dixon v. Alabama State Board of Education*, 294 F. 2d 150 (5 CA, 1961), cert. den. 368 U. S. 930, 7 L. ed. 2d 193, 82 S. Ct. 368, little attention was paid to the subject of

due process in student disciplinary actions based upon misconduct. There a number of students were summarily expelled from a tax-supported college after they had been involved in civil rights demonstrations. Their notice of expulsion did not assign any specific reason for the action but cited only in general terms "the problem" at the college. The circuit court, proceeding on the fundamental principle that "Whenever a governmental body acts so as to injure an individual, the Constitution requires that the act be consonant with due process of law" (*id.*, p. 155), voided the expulsion edict, holding that notice and some opportunity for hearing is required before a student at a tax-supported college is expelled for misconduct. The court specified certain standards requisite, saying in part:

"The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending upon the circumstances of the particular case. . . . [A] hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impractical to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college. In the instant case, the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given the opportunity to present . . . his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf." (pp. 158-159.)

Since *Dixon* there have been many court decisions made across the country and numerous law review treatises written on due process in student disciplinary actions. Various viewpoints have been expressed concerning particular aspects of the subject (for an excellent study see Buss, *"Procedural Due Process For School Discipline: Probing The Constitutional Outline"*, 119 U. of Penn. L. Rev., Feb., 1971, p. 545). An oft-quoted expression where students are involved is one found in *Barker v. Hardway*, 283 F. Supp. 228 (SDWVA, 1968), affirmed 399 F. 2d 638 (4 CA, 1968), cert. den. 394 U. S. 905, 22 L. ed. 2d 217, 89 S. Ct. 1009 (1969):

". . . the touchstones of the application of due process are reasonableness and fairness in view of all the facts and circumstances of the particular case." (p. 237.)

The general rules which have emerged are somewhat more refined in this statement found in Wright, *"The Constitution on the Campus,"* 22 Vand. L. Rev. (Oct., 1969) 1027:

"There is general agreement that four fundamental safeguards are required in every proceeding that may lead to a serious penalty. The student must be advised of the grounds of the charge, he must be informed of the nature of the evidence against him, he must be given an opportunity to be heard in his own defense, and he must not be punished except on the basis of substantial evidence. These requirements are so obvious, and so fundamental, that they require little elaboration." (pp. 1071-1072.)

As already shown, the Kansas response has been the enactment of legislation on the subject of suspension and expulsion of students.

The very rudiments of fair play dictate that a student should have specific and timely notice of the charges against him. Nearly all courts dealing with the subject have so held. Indeed, that seems to be the plain import of 72-8902 (*a*) which, after providing that in all cases wherein a student may be expelled or suspended for misconduct he shall first be suspended for a short time, *written notice* of which short term suspension *and the reason therefor* shall be given within twenty-four hours after imposition, states:

". . . A *written notice* of any proposal to suspend for an extended term or to expel and *the charges upon which the same is based* shall be given to the pupil or student proposed to be suspended or expelled and to his parents or guardians within forty-eight (48) hours [amended to 72 hours by enactment of SB 25 in 1973] after the pupil or student has had imposed a short term suspension. . . ." (Emphasis added.)

Notice of the charges implies giving a student a statement in sufficient detail and sufficiently in advance of the hearing to enable him to prepare a defense (see *Mullane v. Central Hanover Tr. Co.*, 339 U. S. 306 [1950], 94 L. ed. 865, 70 S. Ct. 652) or to present any mitigating circumstances. What is to be considered a "sufficient" statement must depend on the circumstances in each particular case, but at least the substance of the charges and the name of the principal witness to support them should be supplied the student in advance.

Although it may be that appellant, by reason of his appeal and subsequent appearance at the *de novo* hearing, has suffered no prejudice from the failure of the September 12th letter to contain the substance of the charges or the name of any witness, we think it was nonetheless deficient in the respects asserted. A student

might fail to appear at the first administrative hearing and thereby be finally expelled on the basis of an initial notice which really told him nothing at all. Due process should not be departed from upon the theory that future appearance will render the issue moot.

Appellant complains that the examiner failed to base his decision entirely on the evidence presented at the first hearing. This complaint derives from the examiner's testimony at the *de novo* hearing before the board's delegated officer that he did receive opinions from others respecting Gary's placement in school pending the first appeal. It goes without saying that a fair and impartial decision is contemplated and no one should be required to accept clouded disposition of his cause. However, we think a situation is presented where misinterpretation has been placed upon the challenged statements by the examiner. There was nothing to indicate he received or took into account any opinions on the issue of guilt or innocence respecting the assault. He testified specially to the contrary—that he had based his decision solely on his evaluation of the evidence before him. He was interested in appellant's continued attendance in school and in fact recommended his admittance to the Metro school, which offer was declined. We see no factual basis for the charge asserted against the examiner.

Appellant further complains the examiner did not comply with the requirements of 72-8902 (*c*) in that his report contained no finding respecting appellant's return to school pending any appeal or during the time allowed for appeal. This complaint likewise lacks merit. Return to school lies within the sound discretion of the examiner, based on his assessment of the entire situation as stated in the statute. The examiner testified he decided against appellant's return to normal classes, although he failed to put that specific finding in his report as, permissively, he might have done, and he subsequently advised appellant in writing he might attend the Metro school. No prejudicial error appears.

Appellant further attacks the constitutionality of 72-8902 (*a*) (*c*). The thrust of his argument really is that it contemplates short-term suspensions before there has been a hearing and it permits continued removal from school pending final determination. He argues the status quo should be preserved meanwhile. We are aware of no authority or cogent reason for his position where the misconduct charged is of a nature disruptive to the orderly

operation of school. Imposition of relatively minor sanctions should not require a hearing. Subsection (*a*) specifically authorizes a suspension of not to exceed five days without a hearing (in appellant's case his suspension prior to the initial hearing amounted to four school days). Suspension for five days is certainly not an unreasonable period of time within which to conduct an investigation or to attempt to resolve administratively problems arising which are inimical to school welfare. Where disciplinary action no more drastic than that is imposed due process requires no more than that which the statute directs. In *Baker v. Downey City Board of Education*, 307 F. Supp. 517 (C.D. Cal., 1969), the court opined:

". . . [I]f the temporary suspension of a high school student could not be accomplished without first preparing specifications of charges, giving notice of hearing, and holding a hearing, or any combination of these procedures, the discipline and ordered conduct of the educational program and the moral atmosphere required by good educational standards, would be difficult to maintain." (pp. 522-523.)

In similar vein, in *Hernandez v. School District Number One, Denver, Colo.*, 315 F. Supp. 289 (Colo., 1970), we find this:

"The application of such a rule [a hearing prior to suspension] would mean that the plaintiffs could, and the evidence indicates they would, continue their disruptive conduct during the period that written charges were being prepared, an 'impartial decision maker' selected, reasonable notice of the time and the place of the hearing given the plaintiffs, the time necessary to subpoena witnesses and the time required for the hearing. . . . In the meantime, the other students would be denied their right to the educational processes of the school. The requirements of procedural due process cannot be so construed." (p. 293.)

Where long-term suspension or expulsion is proposed then procedural safeguards must be afforded, but once that type of hearing is had and a finding reached that the student is guilty of misconduct warranting his removal from school then there is no due process entitlement to interim reinstatement pending appeal. We see no constitutional infirmity in the challenged statute.

Appellant's principal contention is he was deprived of procedural due process in the denial of the right of confrontation and cross-examination of the witness against him. He presents authority emphasizing the importance of cross-examination where disputed facts are involved, including student discipline cases in which it has been required. Appellees respond with authority to the contrary. They also point out the lack of subpoena power in school

authorities to compel attendance of witnesses and they assert the legislature contemplated affidavits might be used without the affiant being present when it provided in 72-8903(c) for a student's right "to hear or read a full report of testimony of witnesses against him". Appellees concede cross-examination would be in order as to adverse witnesses who voluntarily appear at a hearing.

Courts which have considered the issue of the student's right to cross-examination of the witnesses against him have divided in different directions, indicating the difficulty of prescribing any hard and fast rule applicable to all situations. It would appear at the present time that a majority of jurisdictions favors granting the right under situations similar to that present here. We will attempt no analysis of the many decisions other than to say that in some cases it appears no question has been raised where the right has been exercised, in some it has been either unqualifiedly granted or denied and in others either qualifiedly granted or refused. Although a federal constitutional right is involved the United States supreme court has not spoken directly on the issue. It has held in a free speech and expression case where no disruptive conduct was involved that students in school are "persons" under the constitution (*Tinker v. Des Moines School Dist.*, 393 U. S. 503 [1969], 21 L. ed. 2d 731, 89 S. Ct. 733; see also *Board of Education v. Barnette*, 319 U. S. 624 [1943], 87 L. ed. 1628, 63 S. Ct. 1178).

The federal supreme court has specifically required the right to cross-examination of adverse witnesses as a part of due process in hearings to determine fitness for admission to the bar (*Willner v. Committee on Character*, 373 U. S. 96 [1963], 10 L. ed. 2d 224, 83 S. Ct. 1175); in state criminal proceedings (*Pointer v. Texas*, 380 U. S. 400 [1965], 13 L. ed. 2d 923, 85 S. Ct. 1065); in juvenile delinquency proceedings (*In re Gault*, 387 U. S. 1 [1967], 18 L. ed. 2d 527, 87 S. Ct. 1428), and in hearings to terminate aid to dependent children payments (*Goldberg v. Kelly*, 397 U. S. 254 [1970], 25 L. ed. 2d 287, 90 S. Ct. 1011). In the latter case the court remarked:

"In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." (p. 269.)

Earlier, in a revocation of security clearance proceeding, the court in *Greene v. McElroy*, 360 U. S. 474 (1959), 3 L. ed. 2d 1377, 79 S. Ct. 1400, had this to say:

"Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right 'to be confronted with the witnesses against him.' This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases [citations] but also in all types of cases where administrative and regulatory actions were under scrutiny [citations]." (pp. 496-497.)

The right to cross-examine adverse witnesses on disputed questions of fact can scarcely be over-emphasized. In V Wigmore on Evidence (3d ed.) § 1367, the eminent author expressed these views on its significance in determining truth:

"For two centuries past, the policy of the Anglo-American system of Evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience.

"Not even the abuses, the mishandlings, and the puerilities which are so often found associated with cross-examination have availed to nullify its value. . . . If we omit political considerations of broader range, then cross-examination, not trial by jury, is the great and permanent contribution of the Anglo-American system of law to improved methods of trial-procedure." (pp. 28-29.)

Despite these pronouncements it must be recognized that, outside the criminal area, cross-examination is not an absolute right but depends rather upon a case by case assessment of the circumstances. This is particularly appropriate in student disciplinary cases in the light of the problems peculiar to the school setting where both institutional and individual rights of young people must be considered. We see no objection to the use of affidavits when the testimony is of minor importance or of a cumulative nature. But when the outcome is directly dependent on the credibility of two witnesses (possibly including the student threatened with expulsion) whose statements are directly conflicting, then cross-exami-

nation is imperative in establishing the truth, absent compelling reasons for dispensing with it. When cross-examination is required the school's interest can be protected by holding the hearing in private and by limiting the scope of cross-examination to prevent the student or his lawyer from badgering witnesses. Reasonable restraints on its use can be imposed. Hard and fast rules cannot be prescribed to fit all circumstances. In making a preliminary judgment whether cross-examination should be allowed the question for the hearing officer or body must always be whether fundamental fairness requires it.

In the case at bar we have a situation where identity of the assailant was the critical issue. Such identification as was made came through use of a small year-old photograph. No reason appears in the record as to why the victim did not appear at the hearing other than the fact his parents indicated he preferred not to testify. Conceivably good reason for his nonappearance may have existed but appellees have made no showing on this issue which should be a part of their burden in making the expulsion as they did. Here was a disputed issue of fact where credibility of witnesses was important in reaching a fair decision. This aspect is demonstrated by the report of the hearing officer in which she found the testimony of appellant to be "incredible"—yet the testimony of the opposing witness was never put in the crucible to be thus tested.

In enacting 72-8903 the legislature manifestly did not attempt to prescribe more than minimum standards of procedural due process applicable to all hearings. It could scarcely be expected to anticipate and to declare constitutional guidelines for every possible situation. Nor should its failure to place subpoena power in school authorities be decisive of the particular point at issue since the legislature has no authority to dispense with the requirements of procedural due process and it has not purported to do so. Accordingly we hold that as a matter of due process under the particular circumstances appellant should have been afforded the right to confront and cross-examine the principal witness against him and the trial court erred in ruling otherwise.

Finally, appellant contends the decision to expel him was not based on substantial evidence. His argument simply is that only hearsay evidence was presented against him and this supplies no basis for the action taken. We have already dealt with the confrontation-cross-examination aspect of the testimony. Aside from

this issue, this court has many times held that the term "substantial evidence" means evidence which possesses something of substance and relevant consequence and which furnishes a substantial basis of fact from which the issues can be reasonably resolved (see *Delight Wholesale Co. v. City of Prairie Village,* 208 Kan. 246, 491 P. 2d 910). Measured by this standard the evidence against appellant was substantial.

The judgment is reversed in accordance with the views herein expressed.

APPROVED BY THE COURT.

FROMME, J., dissenting. No quarrel do I have with much of the court's opinion in this case. However, the right of cross-examination during student suspension hearings was not provided for in the suspension hearing act. That is a matter for legislative judgment, for with the right to cross-examine there should be given the power to subpoena witnesses. The right to cross-examine should not be declared by this court in the absence of the power to subpoena witnesses.

We are concerned in the present appeal with proceedings held by school officials who are considering student discipline in a high school. This is not a judicial or quasi judicial proceeding.

One afternoon four separate assaults occurred in the school building. Three of the victims could not or would not identify their assailants. The fourth victim identified his assailant and signed an affidavit in writing reciting the facts surrounding the assault and naming the student responsible. The victim declined to appear at the hearing. He had been assaulted by this same assailant on a previous occasion. The hearing was held by the school officials to consider the matter. The alleged assailant, his mother and his attorney were present at the final hearing which resulted in suspension for the maximum period ending with the current school year. The student in prior semesters had previously suffered two suspensions for assaulting other students in the school building. The hearing with which we are presently concerned is not a criminal or civil trial held under courtroom conditions. It is not a hearing before a governmental administrative tribunal held in quasi judicial surroundings. It is simply a disciplinary proceeding held by school officials to whom is delegated the authority granted by the statute covering the suspension of elementary and high school students.

This should be kept in mind, for procedural due process must be tailored to fit the particular occasion. This court should not require the same procedural due process in our schools that it would require in a courtroom. Neither should this court impose unnecessary procedural requirements upon school officials which are not contemplated in the legislative act which governs the hearings they must conduct. (K. S. A. 72-8901, *et seq.*)

The administration of our public school system has become difficult enough in our permissive society without imposing additional burdens and duties upon the school officials unsupported by a grant of the corresponding power and authority to subpoena witnesses. The statute governing suspension proceedings by school officials enumerates the procedural requirements at such hearings. The right of confrontation and cross-examination is not one of the enumerated requirements.

This act was passed in 1970 and it ushered in a whole new concept of student discipline for the school officials to initiate and follow before suspending any student. The school officials have in most cases accepted the legislative fiat and have substantially complied with the act. They are not lawyers or judges. Now, this court adds a new and heretofore non-existent procedural due process requirement to the already heavy procedural burden imposed by the statute, the right to cross-examine witnesses. The majority hold the right to cross-examine must be afforded "absent compelling reasons for dispensing with it".

There are few if any lawyers so bold as to attempt a definition of that term. I feel certain the term cannot be meaningfully applied by school officials in student suspension hearings. The obvious solution for school officials will be to allow unlimited cross-examination of witnesses in all future student suspension hearings. If this is done the value of affidavits, although permitted by the statute, will be indirectly curtailed or eliminated by this court's decision.

The statute declares the right of the student to have legal counsel of his own choice present "and to receive the advice of such counsel or other person whom he may select." This court now says legal counsel may not only be present and advise but he may cross-examine all witnesses. An experienced trial lawyer, skillful in the art of cross-examination, may well take control of such hearings. The hearing officials of the school, unlearned in the law, cannot be

expected to control the nature or the extent of cross-examination. They hold no contempt powers.

The act which dictates the procedure for these hearings does not grant the right to cross-examine the witnesses. The grant of that right should be left to the sole discretion of the hearing officials. In judicial and quasi judicial hearings there are certain corresponding powers which complement the right to cross-examine witnesses, such as the power to subpoena witnesses, to enforce their attendance and in some cases the power to hold lawyers in contempt for improprieties.

The legislature did not see fit to confer on the school officials the power to compel the attendance of witnesses by subpoena. How then can this court reasonably impose upon the officials a duty which the officials have no way to enforce? If no power to subpoena witnesses exists, the witnesses in the face of a possible grueling cross-examination may well decline to appear. The school officials may well be faced with a dilemma of this court's making.

The majority agree that the case law defining procedural due process does not require that the student be afforded the right of cross-examination in every school discipline case. This is true because they would require it "absent compelling reasons for dispensing with it". Heretofore no such right could be demanded at school hearings. The legislature in the hearing statute (K. S. A. 72-8903) specifically set forth the procedural requirements to be followed and omitted any reference to cross-examination. The statute granted the right to have counsel present and "to receive the advice of such counsel" but it clearly authorized affidavits in writing to be presented and considered. K. S. A. 72-8903 (*d*) provides:

". . . Such regulations shall afford procedural due process, including the following:

"(*d*) the right of the student or pupil to present his own witnesses in person *or their testimony by affidavit,* and". (Emphasis added)

Absent any express provision therefor cross-examination might well be permitted in the discretion of the school officials when a witness appears voluntarily, but that is not the issue here. The right which the student asserts here is the right to require another student, who signed an affidavit under oath, to appear at the hearing and be cross-examined when he has refused or has expressed a desire not to attend. Obviously, without the subpoena power the school officials can do nothing to require attendance. The only

sanctions available to them would be school discipline or striking the affidavit from the files and dismissing the proceedings. The first sanction would be unfair to a student threatened by his peers. The second sanction would obviously defeat the object of disciplinary proceedings and contribute to further disruptions of the educational mission of the school. Neither sanction is a satisfactory solution.

The cases cited and relied upon in the majority opinion clearly recognize that a student suspension hearing does not require the same protections that are afforded in judicial or quasi judicial hearings. In the *Dixon* case, cited by the majority, it is pointed out that the nature of such a hearing should vary depending upon the circumstances. The court in *Dixon* said:

". . . This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. . . ." (294 F. 2d p. 159)

So the federal courts have specifically held that no right of cross-examination need be afforded in school hearings.

The purpose of our school system is to educate young people of school age. That is and must remain the paramount interest of teachers and school officials. Suspension hearings of necessity require the attendance of both students and teachers. Such attendance is bound to disrupt classes and schedules. There must be special considerations given to the circumstances attending school disciplinary hearings. Public school children suspended for misconduct are not criminals. The legal processes due them are less exacting than those due one who is accused under a criminal statute. Suspension proceedings must be viewed in a school setting. The proceedings required should be educationally sound and not place undue burden upon those whose primary duty is to carry on their educational mission.

In *Banks v. Board of Public Instruction of Dade County*, 314 F. Supp. 285 (1970) it was said:

"There are significant factual distinctions between *Dixon* and this case—between a college suspension and a public school suspension. For example, in a college or university, teachers and students are rarely in class for more than a few hours a day, whereas in the public school system teachers and students are in class throughout the day. . . .

"Additionally, the consequences of a public school suspension are considerably less serious than those which follow from a university suspension. . . ." (p. 292)

The hearing in the present case concerns a public school sus-

pension, not a college or university suspension. There is no compelling reason to further burden the beleaguered school officials with additional due process requirements imposed by this court on top of the statutory provisions of K. S. A. 72-8903.

We are concerned here with procedural due process only and not with constitutionally protected liberty or property which are generally affected in judicial or quasi judicial proceedings. The federal courts have recognized a clear distinction. In *Board of Regents v. Roth*, 408 U. S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701, it was said:

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount. But the range of interests protected by procedural due process is not infinite." (p. 569)

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. . . ." (p. 576)

". . . To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." (p. 577)

"We must conclude that the summary judgment for the respondent should not have been granted, since the respondent has not shown that he was deprived of liberty or property protected by the Fourteenth Amendment. . . ." (p. 579)

The foregoing case involved a teaching job at a state university for a fixed term of one year. Refusal to continue the teacher's employment without giving a reason violated no due process rights protected within the Fourteenth Amendment. The same is true in our present case where statutory procedures were followed and the only question is whether those procedures provide for reasonable notice and a fair and impartial hearing.

The court refers to many decisions, including *Goldberg v. Kelly*, 397 U. S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011, which involve the rights of adults in their liberty or property. These cases should not be used as a measure of procedural process in a school suspension case.

Judge Conford of the New Jersey Superior Court in his strong concurring opinion in *Tibbs v. Bd. of Ed. of Tp. of Franklin*, 114

N. J. Super. 287, 276 A. 2d 165, pointed to the difference as follows:

". . . Decisions like *Goldberg v. Kelly,* [supra] involve adverse governmental action against persons who are *sui juris* and not immature members of a controlled high school community in the course of a process of disciplined education. Such decisions are therefore not apposite in the immediate context. . . ." (p. 299)

Governmental boards and commissions authorized to hold administrative hearings of a quasi judicial character are generally, if not always, granted the power and authority to call witnesses and to enforce their attendance at hearings. With this power and authority assured no reason appears why the right of confrontation and cross-examination should not be declared a requirement of procedural due process. A most recent example of this may be found in *Adams v. Marshall,* 212 Kan. 595, 512 P. 2d 365. In *Adams* the Civil Service Commission, before whom the matter of discharge of a police officer was pending, had the power of subpoena together with the authority to enforce attendance at its hearings. This court unanimously held the commission must permit cross-examination of witnesses as a requirement of procedural due process.

However, it is both illogical and undesirable where an administrative body has no authority to compel the attendance of witnesses by subpoena, to hold that the right of confrontation and cross-examination exists. No subpoena power is granted to the Board of Education under the hearing statute. This court has no power to legislate such authority. The lack of this authority indicates no right of confrontation and cross-examination should attend. The subpoena power is *quid pro quo* for the right to confront and cross-examine. (*State ex rel. Ingersoll v. Clapp et al.,* 81 Mont. 200, 263 Pac. 433; *People ex rel. Bluett v. Board of Trustees, Etc.,* 10 Ill. App. 2d 207, 134 N. E. 2d 635; *Tibbs v. Bd. of Ed. of Tp. of Franklin,* supra.)

Therefore I must respectfully dissent from Paragraph (5) (*a*) of the syllabus and the corresponding portions of the opinion.

FATZER, C. J., and SCHROEDER, J., join in the foregoing dissenting opinion.

SCHROEDER, J., dissenting: Not to be outdone by the legislature, the court ventures into an administrative domain to confer "constitutional rights" where they have never heretofore been recognized. I cannot indulge in the fantasy that there exists a vast

thicket in our society to be explored and into which the judicial domain must be extended. Courts that venture into this thicket implanting a banner labeled "constitutional rights" serve as catalysts to promote confusion, expense and prolific litigation into such areas at both the administrative and court levels. For whose well being and for what purpose one may ask?

In my opinion, as applied to the public school system, the precedent here established will serve the revolutionaries in our society best.

I fully join in the dissenting opinion of Mr. Justice Fromme and subscribe to the views therein expressed, but I feel compelled, in view of the gravity of the precedent established by the court, to add a few more reasons why the opinion of the court extending procedural due process for public school discipline is untenable.

In Kansas the period of minority of individual persons extends in males and females to *the age of eighteen years.* (K. S. A. 1972 Supp. 38-101; and K. S. A. 1972 Supp. 38-901 [a] and [n].) The jurisdiction of the juvenile code over children, both male and female, in Kansas was extended by the legislature in 1965 to children *less than eighteen years of age.* (K. S. A. 1972 Supp. 38-802.) The code of *civil procedure* was made to apply to juvenile proceedings by K. S. A. 1972 Supp. 38-813; and the juvenile judge in all hearings in the juvenile court is required to appoint a guardian *ad litem.* (K. S. A. 1972 Supp. 38-821.) The legislature also extended to a child under the age of eighteen years the right to confer with counsel when he or she has been taken into custody by a law enforcement official. (K. S. A. 1972 Supp. 38-839.)

The United States Supreme Court in *Kent v. United States,* 383 U. S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045, required procedural regularity sufficient to satisfy the basic requirements of due process and fairness as to waiver proceedings conducted in the juvenile court, where its exclusive original jurisdiction over a minor child was subject to waiver and transference of the action to the United States District Court for the District of Columbia for a criminal trial. (See, *State v. Coutcher,* 198 Kan. 282, 424 P. 2d 865; *In re Templeton,* 202 Kan. 89, 447 P. 2d 158; and *State v. Hinkle,* 206 Kan. 472, 479 P. 2d 841.)

But it was not until *In re Gault,* 387 U. S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428, recently decided, that restrictions the constitution made applicable *to adversary criminal trials* were extended to the thou-

sands of juvenile courts throughout the nation. There the court (by a majority of five with three justices concurring and one dissenting) held the Bill of Rights safeguards, including notice as provided in the Sixth Amendment, the right to counsel guaranteed by the Sixth Amendment, the right against self-incrimination guaranteed by the Fifth Amendment, and the right to confrontation guaranteed by the Sixth Amendment, apply to protect a juvenile accused in a juvenile court on a charge under which he could be imprisoned for a term of years. The Fifth and Sixth Amendments were made obligatory on the states by the due process clause of the Fourteenth Amendment. Mr. Justice Black in his concurring opinion said: "This holding strikes a well-nigh fatal blow to much that is unique about the juvenile courts in the Nation." (387 U. S. 60.)

The whole purpose and mission of juvenile proceedings established in the nation prior to *Gault* were cast aside and the restrictions made applicable to *adversary criminal trials* were imposed. The departure from precedent and consequences, in my opinion, are well expressed by Mr. Justice Stewart in his dissenting opinion in *Gault*.

Here, however, in the instant case the Supreme Court of Kansas goes beyond *Gault* to establish a precedent even more flagrant in its departure from tradition. It imposes upon administrative proceedings conducted for public school discipline the dignity of a proceeding in juvenile court required by *Gault*, where the juvenile accused could have been *imprisoned* for a period of years. Here Gary L. Smith, a minor and subject to juvenile court jurisdiction had he been charged with the offense in the juvenile court, is subjected at most to expulsion from school.

After conducting the administrative hearing on the 18th day of September, 1972, the hearing examiner on the 20th day of September, 1972, forwarded to Gary L. Smith a letter indicating that the recommendation to expel him from Wichita High School West for the remainder of the 1972-1973 school year was upheld. In an attempt to provide some sort of an educational opportunity for Smith, the hearing examiner directed a letter to Smith dated October 3, 1972, indicating that he could be placed in the Metropolitan School for the remainder of the current semester. But Smith did not accept that offer.

I am convinced, where as here, the court opens the door a little by requiring "procedural due process"—the right to cross-examine

his accuser—all other constitutional due process rights imposed upon juvenile court hearings by *Gault* will follow as a matter of course. Of what value is the right to cross-examine one's accuser if he does not have counsel to assist him in the cross-examination? And so the right to be represented by counsel is imposed, including the right of the indigent to the appointment of counsel, as in criminal cases, to afford him the equal protection of the laws. All other constitutional due process rights spoken of in *Gault* must follow in due course and be imposed upon administrative proceedings conducted for public school discipline because the court is committed to *procedural due process* in such hearings.

The court's eagerness to plunge head on into procedural due process for public school discipline is illustrated by the fact that the issues in this case are *moot*. The 1972-1973 school year has terminated. But the court resourcefully seizes upon the opportunity to call this a declaratory judgment action and proceeds to give its *advisory* opinion.

Under these circumstances the argument that Gary L. Smith, who may be expelled from public school, has the right to be confronted by his accuser and to cross-examine him is fallacious.

It must be recognized that this case is being used as a vehicle to establish a precedent—that "procedural due process" is required in proceedings conducted for public school discipline—and not to correct what on the surface is said to be an abuse of a high school student's rights.

The opinion for the court suggests the court is not aware of the theory of constitutional interpretation it applies to the facts in this case. In the opinion the court says:

"The term due process refers primarily to the methods by which the law is enforced; however the term has no fixed technical concept unrelated to time, place and circumstances. In *Hannah v. Larche,* 363 U. S. 420, 4 L. ed. 2d 1307, 1321, 80 S. Ct. 1502, 1514, this comment was made:

"' "Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. . . . Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding are all considerations which must be taken into account.' (p. 442.)"

To view the court's opinion in its proper context the theories of constitutional interpretation should be explored. The divergent

opinions on this point were discussed by Mr. Justice Black in his concurring opinion in *Gault*, where he said:

"A few words should be added because of the opinion of my Brother HARLAN who rests his concurrence and dissent on the Due Process Clause alone. He reads that clause alone as allowing this Court 'to determine what forms of procedural protection are necessary to guarantee the fundamental fairness of juvenile proceedings' 'in a fashion consistent with the "traditions and conscience of our people." ' Cf. *Rochin v. California*, 342 U. S. 165. He believes that the Due Process Clause gives this Court the power, upon weighing a 'compelling public interest,' to impose on the States only those specific constitutional rights which the Court deems 'imperative' and 'necessary' to comport with the Court's notions of 'fundamental fairness.'

"I cannot subscribe to any such interpretation of the Due Process Clause. Nothing in its words or its history permits it, and 'fair distillations of relevant judicial history' are no substitute for the words and history of the clause itself. The phrase 'due process of law' has through the years evolved as the successor in purpose and meaning to the words 'law of the land' in Magna Charta which more plainly intended to call for a trial according to the existing law of the land in effect at the time an alleged offense had been committed. That provision in Magna Charta was designed to prevent defendants from being tried according to criminal laws or proclamations specifically promulgated to fit particular cases or to attach new consequences to old conduct. Nothing done since Magna Charta can be pointed to as intimating that the Due Process Clause gives courts power to fashion laws in order to meet new conditions, to fit the 'decencies' of changed conditions, or to keep their consciences from being shocked by legislation, state or federal.

"And, of course, the existence of such awesome judicial power cannot be buttressed or created by relying on the word 'procedural.' Whether labeled as 'procedural' or 'substantive,' the Bill of Rights safeguards, far from being mere 'tools with which' other unspecified 'rights could be fully vindicated,' are the very vitals of a sound constitutional legal system designed to protect and safeguard the most cherished liberties of a free people. These safeguards were written into our Constitution not by judges but by Constitution makers. Freedom in this Nation will be far less secure the very moment that it is decided that judges can determine which of these safeguards 'should' or 'should not be imposed' according to their notions of what constitutional provisions are consistent with the 'traditions and conscience of our people.' Judges with such power, even though they profess to 'proceed with restraint,' will be above the Constitution, with power to write it, not merely to interpret it, which I believe to be the only power constitutionally committed to judges.

"There is one ominous sentence, if not more, in my Brother HARLAN's opinion which bodes ill, in my judgment, both for legislative programs and constitutional commands. Speaking of procedural safeguards in the Bill of Rights, he says:

" 'These factors in combination suggest that legislatures may properly expect only a cautious deference for their procedural judgments, but that, conversely, courts must exercise their special responsibility for procedural guarantees with care to permit ample scope for achieving the purposes of legisla-

tive programs. . . . [T]he court should necessarily proceed with restraint.'

"It is to be noted here that this case concerns Bill of Rights Amendments; that the 'procedure' power my Brother HARLAN claims for the Court here relates solely to Bill of Rights safeguards; and that he is here claiming for the Court a supreme power to fashion new Bill of Rights safeguards according to the Court's notions of what fits tradition and conscience. I do not believe that the Constitution vests any such power in judges, either in the Due Process Clause or anywhere else. Consequently, I do not vote to invalidate this Arizona law on the ground that it is 'unfair' but solely on the ground that it violates the Fifth and Sixth Amendments made obligatory on the States by the Fourteenth Amendment. Cf. *Pointer v. Texas*, 380 U. S. 400, 412 (Goldberg, J., concurring). It is enough for me that the Arizona law as here applied collides head-on with the Fifth and Sixth Amendments in the four respects mentioned. The only relevance to me of the Due Process Clause is that it would, of course, violate due process or the 'law of the land' to enforce a law that collides with the Bill of Rights." (pp. 61, 62, 63, 64.)

It seems to me the court is fashioning procedural due process in the instant case to its own whims and caprice—in a fashion consistent with the traditions and conscience of our people. I cannot subscribe to this theory in the interpretation of the Due Process Clause. Obviously, the Fifth and Sixth Amendments to the United States Constitution have no application to the facts here. This is not a criminal prosecution.

To date the United States Supreme Court has not ventured into the thicket of "procedural due process" for public school discipline. The cases relied upon by the court pertain to adversary criminal proceedings or disciplinary problems on the campuses of our colleges and universities.

I would dismiss the appeal as moot.

FATZER, C. J., joins in the foregoing dissenting opinion.