No. 48,342

STATE OF KANSAS, *Appellee,* v. GARY M. MILLER, *Appellant.*

(565 P.2d 228)

Opinion filed June 11, 1977.

*Hugh H. Kreamer,* of Breyfogle, Gardner, Martin, Davis and Kreamer, of Olathe, argued the cause and was on the brief for the appellant.

*David W. Hughes,* Assistant District Attorney, argued the cause, and *Curt T. Schneider,* Attorney General, *Dennis W. Moore,* District Attorney, and *Karen K. Clegg,* Assistant District Attorney, were on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: Defendant-appellant, Gary M. Miller, appeals from a conviction by a jury of murder in the second degree. Defendant

was charged with first degree murder of his wife, Mary, and convicted of the charge. A motion for a new trial was sustained following defendant's conviction. Defendant was again tried on a charge of murder in the first degree, but was convicted of second degree murder and this appeal followed.

Around 4:30 a.m. October 21, 1974, the fire department of Overland Park was notified of a fire at the Miller residence. Shortly thereafter units of the fire and police departments of Overland Park arrived and the fire was extinguished. The burned body of Mary Miller, defendant's wife, was found lying on its back in the northeast bedroom of the residence. In a conversation with police and fire officials at the scene, defendant stated that he and his wife and daughter were in the home during the evening of October 20, 1974. Defendant stated that because his daughter was not feeling well, he went into her bedroom to be with her where he fell asleep. At 4:00 a.m. defendant heard the radio playing in the northeast bedroom where his wife was sleeping. He stated that he again fell asleep in his daughter's bedroom and later was awakened by the smell of smoke. He heard his wife moving about the bedroom and yelled to her to leave the house. He took his daughter from the house and said that he tried to return for his wife, but the smoke was too thick. He took his daughter next door to the residence of Mr. and Mrs. Jerald Jones and Mrs. Jones reported the fire. Defendant and Mr. Jones returned to the Miller residence, but the fire was so far advanced they were unable to enter the house.

The body of Mrs. Miller was removed from the Miller residence and taken to a funeral home where an autopsy was performed by Dr. James Bridgens. Dr. Bridgens testified at trial that Mrs. Miller died as a result of strangulation and that her body was burned after her death. Dr. Bridgens further testified that the time of death was between 9:00 and 11:00 p.m., October 20, 1974. Dr. Bridgens' opinion as to time of death was based on the type and quantity of the contents of the deceased's stomach and on information that she had last eaten at 6:00 p.m.

The day after the fire, defendant signed a consent waiver authorizing the search of his residence. At this time defendant was informed by the police that his wife had died under suspicious circumstances and they wanted to investigate the fire. Defendant was also informed of his *Miranda* rights and signed a

waiver thereof. When questioned about his activities on October 20-21, and the fire, defendant repeated his previous statements made at the scene of the fire. He also stated that the family had eaten a meal of steak and carrots at 6:00 p.m., the previous evening, and then v· .ched television until 1:15 or 1:30 a.m., during which time his wife had a beer and he had a drink.

On October 22, 1974, defendant was again interviewed by police officers. During this conversation defendant asked if the autopsy report had been completed and if the cause of death had been determined. A police officer replied that the matter had not been completed and that the police still had quite a bit of testing to do, but that stab wounds and any type of shooting wounds had been ruled out. After the officer's reply defendant then asked if strangulation had been ruled out. The police had not mentioned to defendant, as yet, that the autopsy indicated strangulation.

Defendant's testimony at trial was generally consistent with the previous statements given to police officers except that he added that his wife had eaten stew containing carrots at 11:00 p.m. on October 20. Defendant also changed his statement that he had been at home the afternoon of October 20 and testified that he had spent the afternoon in the park with his daughter and his mistress. The woman identified as defendant's mistress testified at trial that she was with the defendant and his daughter in the park; that she was having an affair with defendant; and that he had promised to marry her after his divorce became final on October 23, 1974. The evidence at trial disclosed that defendant had never filed for a divorce.

The evidence at trial indicated that the fire originated in the bedroom where Mrs. Miller's body was found. However, the origin of the fire was never definitely determined.

In his first point on appeal defendant contends that Judge Swinehart, who presided at his second trial, committed reversible error in adopting the findings and decision of Judge Musser, who had presided at the first trial, with respect to certain motions which defendant had filed prior to the first trial and then renewed before the second trial. Defendant also contends he was not afforded an opportunity to reargue the motions when they were presented a second time.

The record does not support defendant in his position on this point. The journal entry, filed following the second trial, reflects

that, prior to trial, Judge Swinehart was presented with seven motions by defendant. Pertaining to presentation of the motions, the journal entry reads:

". . . The Court, after listening to statements of counsel and being well and duly advised in the premises, makes the following findings: . . ."

Thereafter the court's findings as to each motion were listed in the journal entry. Some motions were sustained and others overruled. On the record presented we cannot go behind the language of the journal entry with respect to whether argument of counsel was permitted. In this connection in *State v. Hess,* 178 Kan. 452, 289 P. 2d 759, we held:

"An appellate court will not determine the terms of a judgment on controverted and unsupported claims of the parties to the action and must assume the journal entry of judgment correctly reflects the judgment rendered and the facts therein recited notwithstanding a claim by one of the parties to the contrary.

"Upon appeal in a criminal action: (1) Error is never presumed but must be established. (2) If susceptible of a reasonable interpretation to the contrary the record of the proceedings of the trial court will not be interpreted to show error." (Syl. 1 and 2.)

See, also, *City of Wichita v. Catino,* 175 Kan. 657, 265 P. 2d 849; and *State v. Smith,* 171 Kan. 722, 237 P. 2d 388. In any event we take note that no written request for oral argument appears in the record. (Supreme Court Rule No. 133, 220 Kan. LX, formerly Rule No. 114.)

The two matters involved in the motions to which defendant directs our particular attention concern his motion to suppress a statement made by defendant to Detective Grove and his motion to suppress any evidence of the autopsy.

In his point two on appeal, defendant states his position with respect to defendant's statement in these words:

"The court erred in rulings made before and during trial and in particular with reference to a statement made by the appellant to Detective Grove on October 21, 1974, when said statement was not based on an informed consent."

The statement in question, concerning when defendant and his wife had their last meal, was made by defendant during the afternoon of October 21, at the police station where he had gone at the request of the police.

At the time the statement was made, the interrogating officers were aware of the pathologist's opinion that strangulation, and not fire, was the cause of death. We are informed by the state's

brief that in a prior conversation with the police, defendant was told that his wife had died under suspicious circumstances and the police wanted to investigate the fire. Prior to making the admission defendant was advised of his rights. (*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S.Ct. 1602.) During this conversation the police were apparently attempting to determine the time of death. In furtherance of that purpose, defendant's statement was elicited, which established that the last meal eaten by the deceased, consisting of steak and carrots, was consumed at 6:00 p.m. on the day prior to the fire. From this fact, the coroner's pathologist concluded the time of death was between 9:00 and 11:00 p.m., October 20, 1974. On October 22, defendant had another conversation with the police in which he inquired if they had determined whether his wife had died of strangulation.

In support of the suppression of these admissions, defendant argues that the investigation had focussed on him at the time these statements were elicited. Since the police failed to make a complete disclosure to him of the information in their possession, defendant argues he made no knowing and intelligent waiver of his *Miranda* rights.

The state first responds to his contention by arguing that the inculpatory statements were made during an investigatory rather than a custodial interrogation. It is true that general on the scene questioning as to facts surrounding a crime or general questioning of citizens in the fact finding process does not constitute custodial interrogation requiring the giving of the *Miranda* rights. (*State v. Carson,* 216 Kan. 711, 533 P. 2d 1342.) Some of the distinguishing characteristics of custodial interrogations, as distinguished from investigatory interrogations, are set out in *State v. Frizzell,* 207 Kan. 393, 485 P. 2d 160, wherein we held:

"By custodial interrogation is meant the questioning of persons by law enforcement officers which is initiated and conducted while such persons are held in legal custody or are otherwise deprived of their freedom of action in any significant way.

"By investigatory interrogation is meant the questioning of persons by law enforcement officers in a routine manner in an investigation which has not reached an accusatory stage and where such persons are not in legal custody or deprived of their freedom of action in any significant way." (Syl. 1 and 2.)

See, also, *State v. Wasinger,* 220 Kan. 599, 556 P. 2d 189; and *State v. Hinkle,* 206 Kan. 472, 479 P. 2d 841.

In support of the state's argument on this point, it is to be

observed defendant voluntarily came to the police station upon the request of the police, and even after making the inculpatory statement which helped establish the critical time of death, he was allowed to leave. When defendant inquired the following day as to whether the police had determined that his wife had died of strangulation, defendant was apparently subjected to no legal restraints as he was being driven in a police car to the place where he and his brother were staying. Defendant was not arrested until several days after these interviews. In his brief defendant concedes the arrest took place in South Dakota, where he was attending his wife's funeral.

In discussing the impact of *Miranda* and *Escobedo v. Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977, 84 S.Ct. 1758, in *State v. Brunner,* 211 Kan. 596, 507 P. 2d 233, we stated that a person who has not been arrested is not in custody unless there are significant restraints on his freedom. However, we also recognized the "focus" test of *Escobedo* in that where the investigation has become focussed on a particular suspect the investigatory may become accusatory.

In the case at bar, the police would have been deemed derelict in their duties not to have considered defendant the prime suspect at the time of the challenged interviews. They had previously learned the cause of death was not the fire, but rather strangulation. During their initial conversation with defendant, at the scene of the fire, he stated he was awakened by the smell of smoke; *at this time he heard his wife moving about the bedroom* and yelled at her to leave the house. The police investigation having reached the stage described, the instant case is more analogous to *State v. Carson,* supra, wherein a *Miranda* warning was required than to *State v. Frizzell,* supra, and those cases which involved mere investigatory, noncustodial inquiries. In *Carson* we observed that the fact an investigation has focussed on a suspect, standing alone, does not necessitate a *Miranda* warning, but it may be one of the determinative factors in deciding whether such a warning is needed. In our holding in *Carson* we enumerated factors to be considered:

"Circumstances bearing on whether a person questioned was subjected to 'custodial interrogation' requiring Miranda warnings can be classified under the following general headings: (1) The nature of the interrogator; (2) the nature of the suspect; (3) the time and place of the interrogation; (4) the nature of the interrogation; and (5) the progress of the investigation at the time of interrogation." (Syl. 5.)

In the recent case of *State v. Bohanan,* 220 Kan. 121, 551 P. 2d 828, we observed:

". . . Because of the difficulty of formulating a precise definition of 'custodial interrogation' the courts have taken a 'case-by-case' approach to resolving questions of custodial interrogation. (*United States v. Akin,* [C.A. 5th, 1970] 435 F. 2d 1011.) The particular factural circumstances in each case are therefore of the upmost importance." (p. 127.)

Under the facts of this particular case the investigation had reached a point at the time of the challenged utterance so as to require the giving of the *Miranda* warnings to the defendant. However, as the state aptly points out in the second prong of its argument on this contention, the *Miranda* warnings were given to defendant and he signed a written waiver thereof. Defendant, a twenty-seven year old college graduate, testified at the trial that he voluntarily signed the waiver of his own free will, without any coercion, and that he understood everything on the form.

In the recent case of *State v. Barnes,* 220 Kan. 25, 551 P. 2d 815, we held:

"In determining the admissibility of a statement of the defendant obtained during custodial interrogation the trial court must weigh any conflicting evidence and make findings that the defendant voluntarily, knowingly and intelligently waived his Fifth and Sixth Amendment rights. When this is done the court's findings will not be disturbed on appellate review." (Syl. 6.)

In the case at bar the trial court found that a sufficient *Miranda* warning had been given and that a voluntary waiver of rights thereunder had been made by the defendant before defendant's statements were admitted. There being ample evidentiary support for the court's ruling, it cannot be disturbed on appeal.

On this point defendant further contends that his otherwise valid consent was somehow vitiated by the fact that the officers did not disclose all of the information in their hands prior to the interview. When defendant made the statements he was aware the police were investigating the suspicious death of his wife and the suspicious fire at his home. A somewhat similar contention was rejected by this court under analogous circumstances in *State v. Riedel,* 211 Kan. 872, 508 P. 2d 878. We held the fact that a defendant was not specifically advised of the offense he was suspected of committing prior to the interview did not vitiate a knowing and intelligent waiver. Defendant cites no authority

holding that all of the cards of the investigating officers must be laid face up on the table before statements of the accused, otherwise admissible, may be admitted into evidence.

For his third point on appeal defendant contends the trial court erred in admitting any evidence obtained as a result of the autopsy on the body of Mrs. Miller. Defendant argues (a) that he had a property interest in the corpse of his wife, and, therefore, a search warrant was required before the body could lawfully be removed from the premises; (b) that Dr. J. Michael Boles was not the duly appointed coroner in 1973, based on the facts that his four-year appointment beginning in 1969 had expired and he had not taken an oath for that office since 1967; and (c) that Dr. Boles, as a *de facto* coroner, was without authority to order an autopsy on the body of the deceased.

With respect to (a), defendant relies on *Alderman v. Ford,* 146 Kan. 698, 72 P. 2d 981, in support of his argument that the taking of the body of Mrs. Miller and performing an autopsy thereon was an unlawful invasion of defendant's rights. Defendant overlooks the point in *Alderman* where in the court, in delineating the rights of a widow with respect to the body of her dead husband, expressly excepted the right of a coroner to take the body in a proper case. The *Alderman* court said:

". . . So in this case, the plaintiff had a right to the body of her dead husband in the condition in which it was when he died. She alone could give authority for an autopsy on that body, *except in case where death might occur under such circumstances as to warrant the coroner in conducting an autopsy,* a circumstance we do not have here. . . ." (pp. 702-03.) (Emphasis supplied.)

The rights of the immediate family or the next of kin to the body of a deceased person for the purpose of burial are set forth in K.S.A. 19-1015 [now 1976 Supp.]. However, these rights are qualified by following sections concerning the office of district coroner.

K.S.A. 19-1031 provides for the notification of the district coroner or deputy coroner whenever a death occurs in a suspicious or unusual manner or where the determination of the cause of death is held to be in the public interest. The duty of the officers in this case to notify the coroner is not challenged by defendant.

K.S.A. 19-1029 authorizes the coroner to take possession and retain as long as necessary any property important in determining

the cause of death in any case in which notification of the coroner is required.

K.S.A. 19-1032 [now 1976 Supp.] directs the coroner to take charge of the dead body upon receipt of notification under 19-1031.

K.S.A. 19-1033 [now 1976 Supp.] authorizes the coroner to order an autopsy if in his opinion it is advisable and in the public interest.

K.S.A. 19-1030 [now 1976 Supp.] provides the coroner shall hold an inquest upon the dead bodies of such persons when those deaths have been caused by unlawful means or the cause of those deaths are unknown.

Under the foregoing statutes defendant's argument with respect to (b), concerning the necessity of a search warrant for the removal of the corpse, must be rejected. By directing his neighbor to call the police and fire departments, defendant consented to their presence in his residence. Even had defendant objected to their entry, authorized firemen have authority to enter a house and investigate if there is any reason to believe that the fire was of an incendiary origin. (K.S.A. 31-137.) The officers were lawfully within the premises when they became suspicious about the death and the fire. Therefore, evidence, including the dead body, which was in plain view of the officers, was subject to seizure without a warrant. (*State v. Huff,* 220 Kan. 162, 551 P.2d 880; and *State v. Frizzell,* supra.)

Defendant contends there was no legal coroner for the Tenth Judicial District on October 21, 1974, since Dr. Boles had not taken an oath since his original appointment and the term for which he was last appointed had expired. Defendant's technical objections to the legal status of Dr. Boles, as district coroner, cannot serve as a basis for the exclusion of the autopsy evidence as contended by defendant. Dr. Boles was at least a *de facto* district coroner when he ordered the autopsy performed. Dr. Boles was apparently appointed to the office in 1967 and took an oath at that time. His last appointment was January 13, 1969, for a term of four years. He had a color of right or title to the office by reason of his original appointment, although his term had expired. He had acted as coroner since 1967. He had the qualifications for coroner; he was in possession of the office and exercising the duties thereof. The general public and public authorities

believed Dr. Boles to be the coroner and relied on him as such even though his term had expired. These are the classic characteristics of a *de facto* officer. (*Olathe Hospital Foundation, Inc. v. Extendicare, Inc.,* 217 Kan. 546, 539 P. 2d 1; *Will v. City of Herington,* 201 Kan. 627, 443 P. 2d 667; *State v. Roberts,* 130 Kan. 754, 288 Pac. 761; and *Parvin v. Johnson,* 110 Kan. 356, 203 Pac. 721.) As a *de facto* officer his acts were valid insofar as they involved the interest of the public and a third person.

In *Olathe Hospital Foundation, Inc. v. Extendicare, Inc.* supra, the legal status of two members of an appeal panel, established under the provisions of Regional Health Programs Act, was challenged on the grounds that their terms had expired and they had not taken oaths of office prior to the hearing in question. Concerning the characteristics of a *de facto* officer we held:

"A person who assumes and performs the duties of a public office under color of authority and is recognized and accepted as the rightful holder of the office by all who deal with him is a *de facto* officer, even though there may be defects in the manner of his appointment, or he was not eligible for the office, or he failed to conform to some condition precedent to assuming the office." (Syl. 5.)

This court has consistently held that a challenge to the authority of a *de facto* officer must be made at the time he acts and that his actions are not subject to collateral attack. His authority may only be challenged in a direct proceeding brought by the state or one claiming the office. (*Olathe Hospital Foundation, Inc. v. Extendicare, Inc.,* supra; *Parvin v. Johnson,* supra; and *Briggs v. Voss,* 73 Kan. 418, 85 Pac. 571.)

Defendant further complains that no inquest was held by the coroner pursuant to the provisions of K.S.A. 19-1030 [now 1976 Supp.]. In *Uhock v. Hand,* 182 Kan. 419, 320 P. 2d 794, it was held that although an inquest should have been held where the cause of death is unknown, the duty to do so is not jurisdictional to a final judgment in a murder case. We find no error in the admission of evidence obtained from the autopsy.

Finally, defendant contends the trial court erred in failing to submit his requested instructions. In particular, defendant argues the court should have instructed the jury that in order to convict it must find "that the killing was due to strangulation." Included in the instructions given were PIK [Criminal] 56.01, 56.03, 56.04 and 56.05 covering first degree [premeditated] murder, second degree murder, voluntary manslaughter and homicide defini-

tions. They adequately stated the law with respect to the offense charged and offenses included therein. Generally speaking, it is the duty of the trial judge, under K.S.A. 22-3414, to define the offense charged and state to the jury the essential elements of the crime, either in the language of the statute or in appropriate and accurate words of his own. (*State v. Bandt,* 219 Kan. 816, 549 P. 2d 936; *State v. Schriner,* 215 Kan. 86, 523 P. 2d 703; and *State v. Finley,* 208 Kan. 49, 490 P. 2d 630.) In the instant case the only evidence presented at trial as to the cause of death was strangulation. The jury was instructed to decide the case on the evidence presented. It is inconceivable the jury would consider any other cause of death when there was no other evidence on the point. The question for the jury was who or what caused the strangulation. We find no error shown with respect to the instructions given.

We have carefully examined all points raised on appeal and find no error shown.

The judgment is affirmed.