670 S.E.2d 680

SOUTHEASTERN HOUSING FOUNDATION f/k/a Southeastern South Carolina Housing, Inc., Appellant–Respondent,

v.

John Michael SMITH, Stephen Mark Nettles, Sally Smith and Dawn N. Nettles, Defendants,

of whom John Michael Smith and Sally Smith are Respondents–Appellants.

Southeastern Housing Foundation f/k/a Southeastern South Carolina Housing, Inc., Appellant–Respondent,

v.

Calhoun Insurance Agency, Inc. a/k/a Calhoun Insurance Company, Inc. and John Michael Smith, Respondents–Appellants.

No. 4468.

Court of Appeals of South Carolina.

Heard Oct. 7, 2008.

Decided Dec. 12, 2008.

William Howell Morrison, Phyllis W. Ewing, of Charleston, for Appellant–Respondent.

Curtis W. Dowling, R. Jeffords Barham, J. Todd Kincannon, of Columbia, for Respondents–Appellants.

GEATHERS, J.:

This consolidated appeal arises from two suits filed by the nonprofit corporation, Southeastern Housing Foundation (the Foundation). In the first action, the Foundation sued its former attorney, John Michael "Pat" Smith (Smith), Smith's wife, its former developer, Stephen Nettles (Nettles), and Nettles' wife for civil conspiracy, negligence, breach of fiduciary duty, legal malpractice, and misappropriation of assets in connection with several affordable housing financing transactions. In the second action, the Foundation sued Smith and the Calhoun Insurance Agency, of which Smith is the registered agent and a shareholder, for the recovery of real estate and improvements on property leased to the Foundation.

The Foundation appeals the trial court's grant of summary judgment in favor of the Smiths and the Calhoun Insurance Agency. The Foundation argues that the trial court erred in finding the Foundation's newly appointed board of directors (New Board) was not properly installed such that the New Board was unauthorized to file suit on behalf of the Foundation.[1] Smith also appeals on several grounds claiming the trial court improperly vacated its order of summary judgment when it granted the Foundation's motion for relief from judgment under Rule 60(b), SCRCP. Smith mainly contends the Foundation manufactured a post hoc resolution permitting court-appointed custodians to file suit on behalf of the Foundation only after summary judgment was granted, which precluded the resolution from being deemed "newly discovered evidence" as required to grant relief under Rule 60(b)(2), SCRCP. We agree that the trial court properly granted the Foundation's 60(b) motion, and as such, we decline to address the Foundation's arguments for reversing the grant of sum-

---

1. For ease of reference, the Court will refer to "Smith" throughout the opinion for any claims pertaining to Smith, Smith's wife, and the Calhoun Insurance Agency.

mary judgment, save the Foundation's argument regarding the legal malpractice claim.[2]

## FACTS/PROCEDURAL HISTORY

A discussion of the underlying facts and relationships between the parties is necessary for an understanding of this appeal's extensive and complex history.

The Foundation was created in 1976 as a nonprofit corporation pursuant to state and federal law.[3] As stated in its articles of incorporation, its purpose is "to provide, on a nonprofit basis, housing for lower income families, where no adequate housing exists...." Consistent with this purpose, the Foundation is "authorized to engage in or assist in the development or operation of low-income housing...." 24 C.F.R. § 811.102 (2008).

The Foundation's housing operations are largely intertwined with the South Carolina Regional Housing Authority No. 3 (Housing Authority). The Housing Authority is a creature of state law with the "power to acquire property, to remove unsanitary or substandard conditions, to construct and operate housing accommodations and to borrow, expend, lend and repay moneys for [these] purposes...." S.C.Code Ann. §§ 31–3–30, 31–3–910 (Supp.2007). As a quasi-governmental/state entity, the Housing Authority essentially serves as a paid management company for the Foundation's affordable housing properties. *See* S.C.Code Ann. §§ 31–3–20(10), 31–3–450, 31–3–530 (Supp.2007).

Federal regulations governing subsidized housing allow an applicant, such as the Foundation, to participate in programs under Section 11(b) of the United States Housing Act of 1937.[4]

---

**2.** Because the Foundation will have received its requested relief, its remaining issues on appeal will be moot. *See Seabrook v. Knox*, 369 S.C. 191, 197, 631 S.E.2d 907, 910 (2006) (recognizing that this Court will not decide questions on which a judgment rendered will have no practical legal effect).

**3.** The Foundation was originally named "Southeastern South Carolina Housing, Inc." Its name was officially changed on June 5, 1997 to "Southeastern Housing Foundation" to reflect its status as a public benefit corporation.

**4.** As amended and consolidated with other housing statutes to form the Housing and Community Development Act of 1974, 42 U.S.C.A. §§ 1437 to 1437z–8.

The United States Department of Housing and Urban Development (HUD) allows an applicant to qualify for participation in programs under Section 11(b) if the applicant identifies its "parent entity" public housing authority and proves that it is a nonprofit entity that serves as an authorized agency or instrumentality of the parent entity. *See* 24 C.F.R. § 811.105 (2008).

As stated in its bylaws, all of the Foundation's corporate powers were to be exercised by its board of directors, "except as otherwise provided by [HUD] and the Federal Housing Administration." Further, the Foundation was empowered to enter into "a Regulatory Agreement with the Secretary of [HUD] . . . to enable the [Foundation] to secure the benefits of financing with the assistance of mortgage insurance under the provisions of the National Housing Act." To comply with HUD's federal regulations, the Foundation amended its bylaws in 1978 to include a provision that one of its purposes was to "otherwise assist and be utilized as a 'public housing agency' approved by [HUD] . . . [and] by the South Carolina Regional Housing Authority No. 3." The Foundation also stated in this amendment that upon dissolution, its property would vest in the Housing Authority.

After these amendments to its bylaws, the Foundation did not actively operate for almost twenty years. In the mid–1990s, Smith, who served as the part-time Executive Director of the Housing Authority, and Nettles, who served as the Director of Management of the Housing Authority, learned of a program administered by HUD.[5] Under the program, the Secretary of HUD is empowered to enter into contracts with state and local public housing agencies and fund these agencies through annual contribution contracts. *See* 42 U.S.C.A. § 1437f(b) (2008). In turn, the program encourages public housing authorities to establish nonprofits. Once established, a nonprofit entity can own affordable housing, obtain grants for rehabilitation of properties, and enter into management agreements with housing authorities. The concept behind the program was that the Foundation would own the properties,

---

5. Smith, as an original incorporator of the Foundation, served as a member of the Foundation's board of directors from its inception in 1976 until he resigned in July 1997.

but the Housing Authority would manage the properties for a fee.

Pursuant to this program, Nettles and Smith revitalized the Foundation and entered into an agreement with the Housing Authority on July 1, 1996 regarding both entities' roles in the program.[6] Under this agreement, the Foundation agreed to accept the Housing Authority as its "Parent Agency" in order to assist the Foundation with management and financial support until the Foundation became self-sufficient. Consistent with the Foundation's agreement to be managed by the Housing Authority, the General Certificate executed at the first meeting of the revitalized Foundation set forth the board of directors. It stated that three of the four directors were serving "At [the] Will of [the Housing] Authority" and that each was "duly qualified to act in the official [designated] capacity."

After entering into this agreement with the Housing Authority, the Foundation applied for tax-exempt status under 26 U.S.C.A. § 501(c)(3). In its application to the Internal Revenue Service (IRS), the Foundation stated it would buy, rent, and sell houses to low-income families "through and [with the] support [of the] South Carolina Regional Housing Authority No. 3." The Foundation also submitted an opinion letter written by attorney Lee Bowers, which stated that the Foundation was "an agency or instrumentality of the S.C. Regional Housing Authority, No. 3, i.e., parent entity." The Foundation further represented that it would be controlled by and financially accountable to the Housing Authority. Based on these statements and other submissions, the IRS granted the Foundation's application.

The Foundation then began to purchase and finance affordable housing properties, notably the "Marlboro Street Property," which is the subject of the Foundation's second action, in

6. When the Foundation entered into this agreement with the Housing Authority, Nettles was both the Executive Director of the Foundation and Director of Management of the Housing Authority and Smith was the part-time Executive Director of the Housing Authority. This coterminous representation is permissible pursuant to 24 C.F.R. § 811.105(e) (2008) ("Members, officers, or employees of the parent entity [public housing authority] may be directors or officers of the applicant unless this is contrary to state law.").

Barnwell, South Carolina. In almost all of these transactions, Smith, as the Foundation's attorney, and Nettles, as the Foundation's developer, received fees for either legal or development work.

In February 2002, Smith and Nettles had a falling out, which led to mutual accusations of improper conduct and ended with Nettles filing a grievance against Smith with the Housing Authority. Based on these allegations, the Housing Authority's board of commissioners (Board of Commissioners) requested that HUD conduct an audit of the Foundation and directed the Foundation to "[i]mmediately dismiss" its current board of directors. In March 2002, the Housing Authority appointed three of its own commissioners as new board members for the Foundation and assumed control of the Foundation's affairs.

On May 30, 2002, the Housing Authority's legal counsel sent letters to the remaining four former board members (Former Board) requesting their formal resignations and execution of a unanimous consent resolution granting authority to the Housing Authority to elect a new board. In the letter, counsel stated that if the Former Board did not consent, counsel would be required to advise the Board of Commissioners of its legal options. Two of the four members resigned, and when the remaining two members refused, the Housing Authority filed a derivative action against them. In response, the remaining two board members resigned, and the suit was dismissed with prejudice.[7] The Housing Authority then filled the remaining vacancies on the Foundation's board in June 2002.

During the time that the Housing Authority was attempting to obtain the Former Board's resignation, the Inspector General of HUD was performing an audit of the Foundation.[8]

---

**7.** Smith alleges the New Board failed to follow statutory guidelines in filing its unanimous consent resolution to remove the Former Board and in obtaining the written resignations of the Former Board. Because we find the court-appointed custodians, acting as the Foundation, had the authority to file the lawsuits, we decline to address these arguments as the board's former or present constitution has no bearing on the ability of the Foundation to file suit.

**8.** Because the Foundation was a recipient of annual contribution contracts for its low-income housing projects, 42 U.S.C.A. § 1437c(h)(1) required the Foundation to provide HUD with the right to audit.

The report concluded that Smith and Nettles "took advantage of their positions ... to financially benefit themselves, their families, and friends at the expense of [the Housing Authority and the Foundation]." [9] The audit stated that any net earnings beyond those needed for "the retirement of project debt or to carry out low-income housing projects were not to inure to the benefit of any person or entity other than the parent entity, the Authority." As such, HUD concluded that Smith and Nettles' collection of over $958,738 in development and other fees on Foundation property purchases was inappropriate. The audit also opined that the Housing Authority's agreement with the Foundation to provide financial and administrative support was illegal because HUD funds can only be used for projects that have been explicitly approved by HUD.

Based on this audit, the Housing Authority filed suit against Smith regarding alleged incentive compensation he received while Executive Director of the Housing Authority. In addition, the Foundation filed two suits in December 2002, which were later consolidated and are now before this Court. The first suit was against the Smiths and the Nettles to recover the above-mentioned fees and other damages, [10] and the second action was against Smith and the Calhoun Insurance Agency for alleged misdeeds over the purchase and subsequent lease of the Marlboro Street Property. [11]

---

9. At the time of the audit in 1999, the respective board members included: (1) Nettles' wife, Dawn Nettles; (2) Smith's wife, Sally Smith; (3) Smith's employee, Melissa Still; (4) Dawn Nettles' mother, Kathleen Norton; (5) Sally Smith's brother-in-law, Bobby Kinard; (6) Sally Smith's niece and Bobby Kinard's daughter, Julie Welch; and (7) Dawn Nettles' sister, Valerie Kraun.

10. The Foundation also sued Smith's wife, Sally Smith, and Nettles' wife, Dawn Nettles, due to their employment with the Foundation at the time of the alleged wrongdoings. The Foundation has since settled its case against the Nettles.

11. The Foundation filed suit against Smith and the Calhoun Insurance Agency for breach of fiduciary duty, tortious interference with contract, and constructive trust. These claims stemmed from the purchase and subsequent leasing of the Marlboro Street Property, which was used by the Foundation and the Housing Authority for office space. The Foundation alleged that Smith, while legal counsel for the Foundation, improperly assigned the sales contract to himself, charged property taxes to the Foundation, which otherwise would not have accrued due

In April 2005, the Smiths and the Nettles filed a summary judgment motion pursuant to Rule 56, SCRCP, as to all causes of action and alleged the New Board was without authority to file suit on behalf of the Foundation. After the trial court held a hearing on the motion, but before it issued its order, two members of the New Board filed an action for judicial dissolution of the Foundation and petitioned the trial court to appoint a custodian for the Foundation pending the outcome of the litigation. On June 22, 2005, the trial court signed an order appointing three custodians for the Foundation.[12] The trial court authorized the custodians to exercise all powers of the corporation through or in place of the New Board and to sue and defend on behalf of the Foundation. It also expressly charged the custodians with ensuring that the Foundation's financial obligations were met, with ratifying any actions taken by the New Board if in the best interests of the Foundation, and with informing the trial court about the custodians' positions on any pending lawsuits involving the Foundation.

On June 23, 2005, the trial court granted summary judgment in favor of the Smiths and the Nettles on the grounds that the New Board was created illegally and thus lacked the power to file suit on behalf of the Foundation. The trial court also held that the Foundation's claims against Smith for legal malpractice were fatally flawed due to its failure to present an expert witness to establish Smith's required duty of care. Following entry of summary judgment, the Foundation timely filed a Rule 59(e), SCRCP, motion.

On August 1, 2005, two days prior to the trial court's hearing on the 59(e) motion, the custodians filed a resolution with the trial court, ratifying the filing of the lawsuits, which the trial court had voided in its grant of summary judgment. The trial court formally denied the Foundation's 59(e) motion on December 9, 2005, reasoning that because the custodians'

---

to its 501(c)(3) status, and improperly assessed improvements and rental fees against the Foundation. *See Southeastern Housing Foundation f/k/a Southeastern South Carolina Housing, Inc. v. Calhoun Insurance Agency, Inc., and John Michael Smith,* C/A No. 02–CP–06–315.

12. The trial court entered its initial order appointing the custodians on June 6, 2005. After receiving comments from the parties, the trial court amended its initial order on June 22, 2005 and filed the order on June 24, 2005.

resolution was not before the trial court when it initially ruled on the summary judgment motion, it would be improper to consider the custodians' resolution in ruling on the 59(e) motion.

The Foundation then properly perfected an appeal to this Court on December 22, 2005. Almost six months later on June 20, 2006, the Foundation moved for relief from judgment under Rules 60(b)(2) and 60(b)(5), SCRCP, in tandem with a motion to this Court for leave to file the 60(b) motion with the trial court. On August 25, 2006, this Court granted the Foundation's motion for leave, thus conferring jurisdiction on the trial court to address the 60(b) motion.

On November 28, 2006, the trial court granted the Foundation's 60(b)(2), SCRCP, motion finding the custodians' resolution was "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial. . . ." In its order, the trial court found that the New Board's filing of the lawsuit on behalf of the Foundation was a voidable act. However, while the New Board may have been illegally formed, because the Foundation had the authority to bring suit in its name as a distinct jural entity, the subsequent ratification by legally-appointed custodians cured that voidable act. As a result, the custodians' resolution ratifying the New Board's filing of the lawsuits was evidence of the Foundation's intent at the time of the initial filing. Thus, the trial court relieved the Foundation from its earlier summary judgment ruling on all causes of action except its grant of summary judgment in favor of Smith for legal malpractice. The Smiths and the Calhoun Insurance Agency timely filed a Rule 59(e), SCRCP, motion, which the trial court denied on March 26, 2007.[13] This appeal follows.

---

13. The Foundation contends that Smith's appeal is untimely because he failed to appeal the 60(b) motion within thirty days of its issuance. The Foundation argues that a Rule 59(e) motion is only appropriate to alter or amend a "judgment," and because the grant of the 60(b) motion neither dismisses the action nor finally determines the rights of any party, it is not a judgment within the meaning of the Rules. Thus, the 60(b) motion was untimely because the time to appeal was not stayed upon the filing of the 59(e) motion. We disagree. Under this analysis, if the trial court fails to address issues raised by a party at the 60(b) stage, the party would be forced to file a direct appeal without the benefit of first submitting a 59(e) motion to the trial court. Further,

## ISSUES ON APPEAL

█ Smith appeals the trial court's grant of the Foundation's motion for relief from judgment under Rule 60(b)(2), SCRCP, on several grounds.[14] First, Smith argues the custodians' resolution ratifying the Foundation's lawsuit was not "newly discovered evidence" as is required for relief under Rule 60(b)(2), SCRCP. Second, Smith argues the 60(b)(2) motion was filed outside the one-year time limit and was not

---

while a Rule 59(e) motion is a vehicle to alter or amend a judgment, it is also a means to reconsider previously raised issues and arguments. *See Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 21, 602 S.E.2d 772, 778 (2004). Without first submitting a 59(e) motion to the trial court, this Court could then dispose of the party's arguments on error preservation principles. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000) ("The losing party must first try to convince the lower court it is [sic] has ruled wrongly and then, if that effort fails, convince the appellate court that the lower court erred. This principle underlies the long-established preservation requirement that the losing party generally must both present his issues and arguments to the lower court and obtain a ruling before an appellate court will review those issues and arguments."). Because Rules 59 and 60(b) must be read together, Smith's 59(e) motion in response to the 60(b) ruling was proper. *See Gray v. Bryant*, 298 S.C. 285, 287, 379 S.E.2d 894, 895 (1989) ("It is our view that Rules 59 and 60(b) must be read together.").

14. Even if the order granting the 60(b) motion is not immediately appealable, this Court may review an interlocutory order when the order is coupled with an appealable issue. *See Edge v. State Farm Mut. Auto. Ins. Co.*, 366 S.C. 511, 517, 623 S.E.2d 387, 390 (2005); *Briggs v. Richardson*, 273 S.C. 376, 379 n. 1, 256 S.E.2d 544, 546 n. 1 (1979); *Pitts v. Jackson Nat'l Life Ins. Co.*, 352 S.C. 319, 338, 574 S.E.2d 502, 511–12 (Ct.App.2002); *Cox v. Woodmen of World Ins. Co.*, 347 S.C. 460, 469, 556 S.E.2d 397, 402 (Ct.App.2001). *But cf. Pocisk v. Sea Coast Constr.*, 380 S.C. 584, 588, 671 S.E.2d 98, 101 (2008) (Shearouse Adv. Sh. No. 44 at 49) (finding parties' appeal from trial court's order granting 60(b) relief was not immediately appealable where the 60(b) order was the only issue before this Court and the order's appealability was specifically raised on appeal). Because the trial court's grant of summary judgment on the Foundation's legal malpractice claim is a final determination that is properly before this Court, we believe judicial economy argues for the resolution of Smith's arguments on the 60(b) motion at this time. *See Edge*, 366 S.C. at 517, 623 S.E.2d at 390 (finding resolution of partial denial of motion to dismiss was proper when it was coupled with appeal from partial grant of motion to dismiss because resolution of both was "in an effort to avoid another appeal in the future and potentially narrow the issues for trial (i.e. judicial economy)").

filed within a "reasonable time" after the resolution was discovered. Smith additionally contends that the custodians' ratification of the filing of the lawsuits was invalid because the custodians were never properly appointed. Smith next argues that S.C.Code Ann. § 33–31–1008 prohibits a corporation from affecting ongoing litigation through amendments to the articles, and because the custodians' resolution was actually an articles amendment, the trial court erred in relying on it to grant the Foundation relief. Last, Smith alleges the trial court erred when it addressed other issues in its 60(b) ruling, arguing this Court had granted the trial court leave to consider only the effect of the custodians' ratification on these lawsuits.

## STANDARD OF REVIEW

■ Whether to grant or deny a motion under Rule 60(b) lies within the sound discretion of the trial court. *Coleman v. Dunlap*, 306 S.C. 491, 494, 413 S.E.2d 15, 17 (1992). Therefore, our standard of review is limited to determining whether there was an abuse of discretion. *Raby Const., L.L.P. v. Orr*, 358 S.C. 10, 18, 594 S.E.2d 478, 482 (2004). An abuse of discretion arises when the order was controlled by an error of law or when the order is based on factual conclusions that are without evidentiary support. *Tri–County Ice & Fuel Co. v. Palmetto Ice Co.*, 303 S.C. 237, 242, 399 S.E.2d 779, 782 (1990).

## LAW/ANAYSIS

### I. The Custodial Resolution as Newly Discovered Evidence

### A. Existence of Resolution at Time of Summary Judgment

■ Smith contends the trial court erred in granting the 60(b) motion because the custodial resolution was "manufactured" after summary judgment and thus cannot be deemed "newly discovered evidence" under Rule 60(b)(2), SCRCP. We disagree.

■ A trial court may relieve a party from a final judgment, order, or proceeding if "newly discovered evidence which by due diligence could not have been discovered in time

to move from a new trial under Rule 59(b)" is presented to the trial court. Rule 60(b)(2), SCRCP. Evidence is not "newly discovered" if it is known to the party at trial and in the party's possession. *Lanier v. Lanier,* 364 S.C. 211, 218, 612 S.E.2d 456, 459 (Ct.App.2005).

The newly discovered evidence at issue is the custodians' resolution ratifying the Foundation's filing of the lawsuits. On June 22, 2005, one day before the trial court granted summary judgment, the trial court signed an order appointing the custodians and charged them with reporting to the trial court within twenty days of the order's filing on whether it would be in the Foundation's best interests to file a lawsuit against the Smiths and the Calhoun Insurance Agency. The trial court then granted summary judgment on June 23, 2005. The Foundation then filed a 59(e) motion, and the custodians' resolution ratifying the lawsuits was filed less than a month later with the trial court on August 1, 2005. Because the resolution could not have been filed with the trial court before entry of summary judgment or in time to move for a new trial under Rule 59(b), SCRCP, the resolution is the proper subject of a 60(b)(2) motion.[15]

Furthermore, because the trial court found the New Board was illegally constituted in its summary judgment order, it was only with the judicial appointment of the custodians and their subsequent investigation that the Foundation's pre-existing intent to file suit could properly be considered by the trial court. *See Peacock v. Bd. of Sch. Comm'rs,* 721 F.2d 210, 214 (7th Cir.1983) (generally finding that material not in existence until after trial falls within 60(b)(2) only if it pertains to facts in existence at time of trial). While the resolution may not have been in existence until after summary judgment was granted, the resolution was evidence of the Foundation's corporate will at the time of filing and thus was properly considered as "newly discovered evidence." *See Gray,* 298 S.C. at 287, 379 S.E.2d at 896 (finding juror's letter to newspaper praising doctors and criticizing parties who sue them, which was written on the same day the jury returned a verdict in

---

**15.** A motion for a new trial pursuant to Rule 59(b) "shall be made not later than 10 days after the receipt of written notice of the entry of judgment or of the filing of an order disposing of the action, if no judgment has been entered." Rule 59, SCRCP.

favor of the defendant doctor and published two weeks after verdict, revealed a preexisting bias and was newly discovered evidence for purposes of Rule 60(b)); *Amesco Exports, Inc. v. Assoc. Aircraft Mfg. & Sales, Inc.,* 87 F.Supp.2d 1013, 1015 (C.D.Cal.1997) (finding plaintiff corporation's receipt of letter from tax commission advising it of conditional revival of its corporate status constituted newly discovered evidence for purposes of 60(b)(2) warranting relief from final judgment); *Nat'l Anti–Hunger Coal. v. Exec. Comm. of the President's Private Sector Survey on Cost Control,* 711 F.2d 1071, 1075 n. 3 (D.C.Cir.1983) (stating task reports that came into existence after lower court's decision pertained to facts in existence at time of decision which supported a finding that the reports were newly discovered evidence within the meaning of Rule 60(b), FRCP); 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2859 (2d ed.2008) (stating "Rule 60(b)(2) has proved useful, especially when the newly discovered evidence calls into question the validity of the judgment by directly refuting the underpinnings of the theory which prevailed").

### B. Establishment of *Lanier* Elements as Prerequisite for 60(b) Relief

Smith additionally argues the resolution was not the proper subject of a 60(b) motion because the Foundation failed to satisfy the first and fifth elements from *Lanier v. Lanier,* 364 S.C. 211, 612 S.E.2d 456 (Ct.App.2005), thus forfeiting the Foundation's right to relief under Rule 60(b)(2), SCRCP.

■ In *Lanier,* we stated that to receive a new trial based on newly discovered evidence, the moving party must establish that the newly discovered evidence: "(1) will probably change the result if a new trial is granted; (2) has been discovered since the trial; (3) could not have been discovered before the trial; (4) is material to the issue; and (5) is not merely cumulative or impeaching." *Id.* at 217, 612 S.E.2d at 459. The five-part test recited in *Lanier* is yet another way of restating Rule 60(b)(2)'s requirements. *See* 12 *Moore's Federal Practice* § 60.42[2] (Matthew Bender 3d ed.) (discussing various element tests for Rule 60(b)(2)).

 Smith's argument that the Foundation failed to establish or even discuss the first and fifth elements is unsubstantiated. The Foundation specifically stated in its 60(b) motion that the resolution was material and determinative of the Foundation's ability to file suit and was not cumulative or impeaching. Furthermore, the trial court specifically acknowledged and applied this test from *Lanier* in its 60(b) order. The trial court noted the resolution was outcome changing because the Foundation lacked the authority to bring suit prior to the resolution. With the resolution's filing, facts supporting the Foundation's intent to file suit were in evidence. This resulted in the revival of all causes of actions, save the legal malpractice suit, against the Smiths, the Nettles, and the Calhoun Insurance Agency, and thus changed the outcome. In addition, the resolution was not merely cumulative or impeaching as it was the first evidence of the Foundation's corporate intent at the time of the filing of the lawsuits. The Foundation even elaborated on the fact that the resolution was not cumulative or impeaching at the 59(e) hearing to reconsider the 60(b) motion. Consequently, the trial court properly considered the custodial resolution as "newly discovered evidence" pursuant to *Lanier* and Rule 60(b)(2), SCRCP.

## II. Filing of the Resolution within the Time Limitations of Rule 60(b)

 Smith claims the Foundation failed to file its Rule 60(b) motion within a reasonable time and further alleges the motion was filed outside the absolute one-year time limit. Smith contends the Foundation's filing of its 60(b) motion with the trial court on September 12, 2006 was untimely as the date of the trial court's order granting summary judgment on June 23, 2005, rather than the date of its order denying the Foundation's 59(e) motion on December 9, 2005, controls. We disagree.

 A Rule 60(b)(2) motion "shall be made within a reasonable time, and ... not more than one year after the judgment, order or proceeding was entered or taken." Rule 60(b), SCRCP. The one-year limit is non-discretionary, whereas the "reasonable time" limit is discretionary and should be determined under the facts and circumstance of each case. *Coleman*, 303 S.C. at 513, 402 S.E.2d at 183.

The precise question presented in this case is whether the time limit, which normally runs from the date of the judgment's entry, is stayed by the filing of a Rule 59(e) motion. Rule 203(b), SCACR, which discusses the motions that stay the time to file an appeal, is instructive on this question. The rule states:

When a timely motion for judgment n.o.v. (Rule 50, SCRCP), motion to alter or amend the judgment (Rules 52 and 59, SCRCP), or a motion for a new trial (Rule 59, SCRCP) has been made, the time for appeal for all parties shall be stayed and shall run from receipt of written notice of entry of the order granting or denying such motion. When a form or other short order or judgment indicates that a more full and complete order or judgment is to follow, a party need not appeal until receipt of written notice of entry of the more complete order or judgment.

Rule 203(b)(1), SCACR.

Under this rule, if a party does not have to appeal to this Court while a 59(e) motion is pending because the finality of the challenged judgment has been removed, it follows that a party does not have to file a 60(b) motion with the trial court until the trial court issues its ruling on the 59(e) motion. *See Coward Hund Const. Co., Inc. v. Ball Corp.*, 336 S.C. 1, 3, 518 S.E.2d 56, 58 (Ct.App.1999) (basing the commencement of the time period for appeal on the finality of a judgment). For the same reason, a trial court plausibly could amend not only a judgment but also could reconsider its prior ruling on issues or arguments in response to a 59(e) motion. *See Elam,* 361 S.C. at 21, 602 S.E.2d at 779 (stating "it is proper to view a Rule 59(e) motion not only as a vehicle to request the trial court to 'alter or amend the judgment,' but also as a vehicle to seek 'reconsideration' of issues and arguments"). If a party were forced to file a 60(b) motion before it receives the trial court's 59(e) ruling, it would create unnecessary paperwork for the court system, increased costs and fees, and greater confusion for the parties. Unless the newly discovered evidence is revealed in time to move for a new trial under Rule 59(b), a party's only choice is to wait on the trial court's 59(e) ruling and then promptly file a 60(b) motion. As in the instant case, it is possible that the trial court could take several months to formally rule on a 59(e) motion. Under Smith's view of 60(b),

the trial court's timeliness in granting or denying a Rule 59(e) motion could result in prejudice to the moving party, which we believe is inherently unfair.

The trial court granted summary judgment in Smith's favor on June 23, 2005, and formally denied the Foundation's Rule 59(e) motion on December 9, 2005. Based on the above-stated reasoning, the one-year deadline for filing the Foundation's Rule 60(b) motion began to run at the entry of summary judgment and then was tolled with the Foundation's filing of the 59(e) motion. The time to file then began to run again when the trial court denied the Foundation's 59(e) motion on December 9, 2005. The Foundation properly filed its 60(b) motion on September 12, 2006, well within the one-year time frame. Moreover, the Foundation filed the motion within a "reasonable time" as it properly requested leave to file the 60(b) motion with this Court on June 20, 2006. *See* Rule 60, SCRCP (stating that "[d]uring the pendency of an appeal, leave to make [a 60(b)] motion must be obtained from the appellate court"). We ruled on the motion on August 25, 2006, and the Foundation promptly filed its 60(b) motion with the trial court less than a month after this Court's ruling. As such, the 60(b) motion was filed both within the one-year time limit and within a reasonable time.

## III. Lawful Appointment of Custodians[16]

 Smith argues the custodians' ratification of the lawsuits was null and void because the trial court was without authority to lawfully appoint the custodians. Smith contends Buccie Harley (Harley) and Doug Haley (Haley), the petitioners for custodial appointment, were not within the class of persons allowed to petition for judicial dissolution, so the trial

---

16. The Foundation asserts in its brief that Smith cannot attack the validity of the custodians as Smith never appealed from the trial court's appointment order, and thus, Smith's attack on the validity of the custodial appointment is an improper collateral attack. Because the appointment of a custodian, as contrasted with the appointment of a receiver, is an interlocutory order and thus not immediately appealable based on this Court's decision in *Shapemasters Golf Course Builders, Inc., v. Shapemasters, Inc.*, 360 S.C. 473, 602 S.E.2d 83 (Ct.App.2004), we will address Smith's argument. We express no opinion on whether Smith's failure to appear at the hearing on the custodians' appointment renders his attack on the appointment improper.

court's appointment of the custodians during the pendency of the judicial dissolution was void. We disagree.

Harley and Haley, as members of the New Board, petitioned the trial court for judicial dissolution pursuant to S.C.Code Ann. § 33–31–1430 (Supp.2007) and for custodial appointment pursuant to S.C.Code Ann. § 33–31–1432 (Supp. 2007).[17] Whether or not they were de jure directors on the New Board, they acted under color of authority to protect the interests of the Foundation. *See Vestry of St. Luke's Church v. Mathews,* 4 S.C. Eq. 578, 587–88 (1815) (finding an appointee may become a de jure officer when appointed by a de facto board or officer). When a "de facto" director or officer acts under color of right in assuming or performing a duty of that office, the action is sustainable. *See id.* at 587 (stating "trustees, even if not regularly elected, were at least trustees by colour [sic] of office, and their acts would be good"); *see also* 19 C.J.S. Corporations § 560 (2008) (stating a person may exercise the duties of an officer or director if the person possesses the office and exercises its duties under an appearance of right even if he or she is not an officer or director de jure by reason of ineligibility or lack of qualification or being unlawfully elected); 18B Am.Jur.2d Corporations § 1411 (2008) (noting that "[i]f the officers of a corporation exceed their authority and the act is one that could have been authorized in the first instance, the act may be expressly or impliedly ratified and, thus, be rendered just as binding as if it had been authorized when done"); *cf. State v. Miller,* 222 Kan. 405, 565 P.2d 228, 229 (1977) (finding that a "de facto officer" is a person who assumes and performs a duty of office under color of authority and is recognized and accepted as a rightful holder of office, despite defects in the manner of appointment or his or her failure to conform to a condition precedent). Thus, because they acted under color of authority to carry out a lawful act, Harley and Haley's petition for

17. Harley and Haley also served coextensively on the Housing Authority's Board of Commissioners when they petitioned for judicial dissolution and custodial appointment. *See* 24 C.F.R. § 811.105(e) (2008) ("Members, officers, or employees of the parent entity PHA may be directors of officers of the applicant unless this is contrary to state law.").

judicial dissolution under § 33–31–1430(a)(2) is sustainable at law.

Furthermore, Smith's argument ignores the fact that the Housing Authority and the Foundation are in a statutorily-created relationship that renders the Foundation accountable to the Housing Authority. While Smith argues the New Board's failure to be elected by the Former Board, as required by S.C.Code Ann. § 33–31–804(b), prevented the New Board from being valid, this argument ignores the interplay of the provisions of the National Housing Act. The Foundation is a South Carolina nonprofit corporation, and thus subject to the South Carolina Nonprofit Act, but it is also created pursuant to the National Housing Act and as a result is subject to those provisions as well.

Under the National Housing Act, the Foundation is "an agency or instrumentality" of the "parent entity" Housing Authority. 24 C.F.R. § 811.102. As reflected in the Foundation's bylaws, one of its purposes is to "otherwise assist and be utilized as a 'public housing agency' [as] approved by the Department of Housing and Urban Development ... [and] by the South Carolina Regional Housing Authority No. 3." The Housing Authority has a vested interest in preserving and protecting the Foundation's assets, as the bylaws state, "In the event of the dissolution of the [Foundation] ... the [Foundation's] property shall be given, conveyed and distributed to and shall vest in the South Carolina Regional Housing Authority No. 3 . . . ." This provision reflects the federal requirement "that upon dissolution of the applicant, title to or other interest in any real or personal property that is owned by such applicant at the time of dissolution shall be transferred to the parent entity [public housing authority]." 24 C.F.R. § 811.105(c)(6). Because of this relationship, the Housing Authority has a direct interest in the affairs of the Foundation. Without Harley and Haley's initiation of the dissolution and custodial appointment proceedings, the Housing Authority's ability to preserve and protect assets to which it is statutorily entitled could be threatened.

Furthermore, regardless of whether Harley and Haley petitioned the trial court as the Foundation's de jure or de facto directors, we note that neither Smith nor his counsel appeared

at the hearing for custodial appointment, even after having received notice as an interested party. At the Rule 59(e) hearing to reconsider the 60(b) motion, Smith's counsel told the trial court that he did not attend the custodian hearing because the appointment would not affect Smith, but agreed at that time that "it was a very good idea that the custodian[s] be appointed." Despite Smith's role and interest in the Foundation and the Housing Authority, he never sought to intervene, which we fail to understand given Smith's current position on the custodians' appointment.

Based on all of the above, the trial court's appointment of the custodians was proper. Because their appointment was valid, the trial court was within its power to charge the custodians with exercising all the powers of the Foundation, including the power to sue and defend on behalf of the Foundation.

### IV. Custodial Resolution's Effect on Ongoing Litigation

Smith contends the trial court's consideration of the custodial resolution at the 60(b) hearing was error as the Foundation is statutorily prohibited from affecting ongoing litigation through an articles amendment. We disagree.

S.C.Code Ann. § 33–31–1008 (Supp.2007) states, "An amendment to [the] articles of incorporation does not affect a cause of action existing against or in favor of the corporation, [or] a proceeding to which the corporation is a party. . . ."

Smith argues the resolution filed with the Secretary of State is an articles amendment and thus was improperly before the trial court at the 60(b) hearing. However, the document at issue is entitled, "Resolution To Approve, Adopt & Ratify Previous Actions Of The Corporation And To Take Additional Actions With Respect Thereto." Within the body of the resolution, there is no mention of any amendments to the articles and the language specifically states, "This *resolution* is adopted by the Corporation with the unanimous written consent of the Custodians as evidenced by their individual signatures below." (emphasis added).

David Miller (Miller), one of the court-appointed custodians, filed the resolution with the Secretary of State and testified at the 60(b) hearing. Miller stated that he went to file the

resolution "late in the day" on June 28, 2005, and when he handed it to a clerk at the Secretary of State, she returned it with a coversheet entitled, "Nonprofit Corporation Articles of Amendment." Miller testified he specifically told the clerk it was not an articles amendment. The clerk stated the coversheet was a formality and had to be completed for the resolution to be filed with the Secretary of State. When Miller filled out the coversheet, most of his responses were "n/a [not applicable]" as the questions pertained to amending the articles of the corporation. Miller stated the coversheet was not attached to the resolution when he came to the Secretary of State's office, and were it not for the clerk's insistence that it be filled out as a prerequisite to filing the resolution, he would not have completed it.

Miller's testimony and the resolution itself prove it was not an articles amendment but was a properly-created custodial resolution. Further, while Smith argues the Foundation's failure to take corrective action renders the resolution an articles amendment that cannot be considered for purposes of this litigation, any alleged error was on the face of the coversheet, not within the body of the resolution. The coversheet was not created by the custodians or the Foundation, rather it was a "form revised by the South Carolina Secretary of State" and per the filing instructions on the coversheet, two copies of the form had to be completed for the resolution to be filed. As the coversheet was not contained within the body of the resolution and there are no facts within the resolution to indicate it is an articles amendment, the trial court properly considered the resolution at the 60(b) hearing.

## V. Whether the Trial Court Considered Matters Outside the Scope of its Jurisdiction in its 60(b) Order

Smith lastly argues that all causes of action against him were essentially legal malpractice claims. Smith contends that the Foundation's failure to present an expert at summary judgment thus extinguished all of the Foundation's causes of action against him. Smith claims that because the issue of the necessity of a legal malpractice expert is still on appeal, the trial court did not have jurisdiction to reinstate all of the causes of action against Smith as the legal malpractice issue encompassed the remaining causes of action. We disagree.

The trial court's summary judgment order stated that all causes of action against Smith, including "legal malpractice, negligence, breach of fiduciary duty, conspiracy, misappropriation of assets, tortious interference with contract, and constructive trust ... are based on some alleged breach of duty or loyalty to the Foundation or some conflict of interest in disregard of the Foundation's rights." Smith argues this statement proves that Smith's legal representation of the Foundation is a common thread in all of the Foundation's claims.

However, before the trial court issued the summary judgment order, it notified the parties in writing that "an expert witness would be required to establish a standard of care and any deviations therefrom on the *legal malpractice actions*." (emphasis added). After receiving this letter, Smith's counsel drafted a proposed summary judgment order dismissing "these actions" against Smith for the Foundation's failure to name an expert. At the 59(e) hearing to reconsider the 60(b) motion, when the trial court realized Smith construed the summary judgment order as dismissing all causes of action against Smith, the trial court clarified any misconceptions regarding the scope of its prior order. The trial court stated,

> My intention was to send it back to let everything be heard except the legal malpractice claim ... [The Foundation] didn't give me an expert and the legal malpractice case was gone and everything else against Mr. Smith was viable except for [the Foundation] didn't follow the corporate formalities ... all other issues not dealing with legal malpractice, we're back to square one where we're going to try the case.... What I intended to do all along was to dismiss the legal malpractice case because there was no expert. I also dismissed the other part of the case because [ ] corporate formalities were not followed. I overrule or change my mind on that based on the corporate resolution. I am still of the opinion which leaves us with the legal malpractice case gone and the other actions, whatever they may be, if any, still pending.

While the trial court may have initially stated that the lack of a legal expert affected all of the claims against Smith, the court had the power to amend and clarify any misconceptions at the 59(e) stage. *See* Rule 59, SCRCP. Smith raised the

issue of whether the trial court had jurisdiction in his 59(e) motion, and the trial court was proper to address this issue at the 59(e) hearing. *See Elam,* 361 S.C. at 24, 602 S.E.2d at 780 ("A party *may* wish to file [ ] a [59(e) ] motion when [the party] believes the court has misunderstood, failed to fully consider, or perhaps failed to rule on an argument or issue, and the party wishes for the court to reconsider or rule on it.") (emphasis in original).

The trial court's 60(b) ruling demonstrates the intended scope of the order as well: "[The Foundation] is relieved from summary judgment in both actions on *all* causes of action *except the aforementioned legal malpractice action* against John Michael Smith." (emphasis added). The trial court clearly intended for the ratification to moot all issues regarding the exercise of corporate powers and to restore all the causes of action, except the legal malpractice claim.

Furthermore, the pleadings show the legal malpractice claim was distinct from the other claims as it was a separately pled cause of action against Smith in the Foundation's first complaint. As such, the Foundation's failure to proffer an expert for that claim in no way affects the Foundation's remaining claims for civil conspiracy, negligence, misappropriation of assets, tortious interference with contract, and constructive trust.[18] Those remaining causes of actions are still viable as to Smith, his wife, and the Calhoun Insurance Agency. A legal malpractice expert would not aid the jury in determining whether the Foundation should recover for those claims, as Smith's wife is not an attorney and the Calhoun Insurance Agency is not a law firm. Consequently, the trial court was within its power to find that the custodial resolution ratifying the filing of the lawsuits revived all causes of action, exclusive of the legal malpractice claim, against the Smiths and the Calhoun Insurance Agency.

---

18. We recognize the dismissal of the legal malpractice claim would extinguish the breach of fiduciary duty cause of action against Smith in the first action. However, whether Smith can still be found to have breached a duty to the Foundation as the Executive Director of the Housing Authority, as the registered agent and shareholder of the Calhoun Insurance Agency, or as a board member of the Foundation in the second action is still a jury question regardless of his role as the Foundation's attorney.

## VI. Foundation's Failure to Proffer an Expert Witness

The Foundation argues the trial court erred in finding that the lack of an expert witness was fatal to the Foundation's legal malpractice action against Smith, as Smith's actions were obvious violations of his legal duties. We disagree.

"In South Carolina, the plaintiff in a legal malpractice suit must prove several elements: (1) the existence of an attorney-client relationship; (2) a breach of duty by the attorney; (3) damage to the client; and (4) proximate cause of the plaintiff's damages by the breach." *Hall v. Fedor*, 349 S.C. 169, 174, 561 S.E.2d 654, 656 (Ct.App.2002). Typically, a plaintiff in a legal malpractice case must establish the standard of care through expert testimony, unless the subject matter is of common knowledge to laypersons. *Sims v. Hall*, 357 S.C. 288, 295–96, 592 S.E.2d 315, 319 (Ct.App.2003). With the aid of expert testimony, "the jury is able to analyze the attorney's conduct and measure it against the action that a competent attorney would be expected to take under the same circumstances." *Cianbro Corp. v. Jeffcoat & Martin*, 804 F.Supp. 784, 793 (D.S.C.1992).

The Foundation argues that Smith's malpractice falls within the common knowledge exception because his actions are statutorily prohibited by S.C.Code Ann. § 31–3–360 (Supp. 2007). Section 31–3–360 prohibits an employee or commissioner of a housing authority from "acquir[ing] any interest, direct or indirect, in any project or in any property included or planned to be included in any project, nor shall [an employee] have any interest, direct or indirect, in any contract or proposed contract for materials or services to be furnished or used in connection with any project."

Because Smith recouped attorney and development fees over the course of his employment with the Housing Authority, the Foundation argues he was plainly in contravention of the statute, and thus no expert was necessary. While Smith may be liable for any inappropriate commissions or fees recouped during his tenure as a director or a board member pursuant to this section, this statute is not conclusive on whether he breached a duty to the Foundation as its attorney. Further, given the extended duration of Smith's involvement with the Foundation and the Housing Authority and the

complex nature of many of the property and business transactions in which he represented the Foundation, the Foundation should have presented expert testimony, by affidavit or otherwise, at the summary judgment stage. As the standard of care for legal malpractice is outside the ambit of the common knowledge of laypersons, the Foundation's failure to present this evidence precludes the Foundation from bringing the legal malpractice claim against Smith at trial.

## CONCLUSION

Accordingly, the trial court's order is

**AFFIRMED.**

HEARN, C.J., and HUFF, J., concur.